## QUINN v. UNITED STATES.

### No. 11081.

United States Court of Appeals
District of Columbia Circuit.

Argued Jan. 21, 1952.

Reargued May 27, 1952.

Decided Dec. 19, 1952.

Petition for Rehearing Denied
April 13, 1953.

David Scribner, pro hac vice, by special leave of Court, with whom Allan R. Rosenberg, Washington, D. C., was on the brief, for appellant.

Charles B. Murray, Asst. U. S. Atty., Washington, D. C., at the time of argument, with whom Charles M. Irelan, U. S. Atty. and Joseph M. Howard, Asst. U. S. Atty., Washington, D. C., were on the brief, for appellee. George Morris Fay, U. S. Atty. when the record was filed Washington, D. C., also entered his appearance on behalf of appellee.

Before STEPHENS, Chief Judge, and EDGERTON, CLARK, WILBUR K. MILLER, PRETTYMAN, PROCTOR, BAZELON, FAHY and WASHINGTON, Circuit Judges.

PRETTYMAN, Circuit Judge.

Appellant was indicted for refusing to answer a question asked by a subcommittee of the Committee on Un-American Activities of the House of Representatives. The question was whether he was or ever had been a member of the Communist Party. He was tried by a judge of the District Court without a jury and was convicted.

When appellant was asked the crucial question before the subcommittee, the following colloquy occurred:

"Mr. Quinn. I would like to make a statement along the lines that Mr. Fitzpatrick made yesterday in regard to a question of that nature. I feel that the political beliefs, opinions, and associations of the American people can be held secret if they so desire.

"Mr. Wood. And for those reasons you decline to answer the question?

"Mr. Quinn. I didn't say I was declining to answer the question. Before I do answer the question, I should like to say that I support the position taken by Brother Fitzpatrick yesterday.

"Mr. Wood. Did you hear his statement yesterday?

"Mr. Quinn. Yes; I did.

"Mr. Wood. Do you support it in its entirety?

"Mr. Quinn. In its entirety.

"Mr. Wood. Is there anything else you want to add to it?

"Mr. Quinn. No; I don't.

"Mr. Wood. Will you accept it as the expression of your views, then?

"Mr. Quinn. You may. I may add I feel I have no other choice in this matter, because the defense of the Constitution, I hold sacred. I don't feel I am hiding behind the Constitution, but in this case I am standing before it, defending it, as small as I am.

\*    \*    \*    \*    \*    \*

"Mr. Wood. You have stated your position. Having enunciated your sentiments and your position, will you now answer the question whether you are now or ever have been a member of the Communist Party, or do you decline to answer.

"Mr. Quinn. I decline to discuss with the committee questions of that nature."

1. United States v. Emspak, D.C.D.C.1951, 95 F.Supp. 1010; United States v. Emspak, D.C.D.C.1951, 95 F.Supp. 1012.

The record shows that on the day preceding that of the interrogation of appellant, the subcommittee had questioned one Thomas Fitzpatrick, who had made an extended statement.

Having been indicted for refusal to answer the question put to him, Quinn moved to dismiss the indictment upon a number of grounds. The motion was denied.[1] He was tried by a judge without a jury. His defense, so far as pertinent to the present appeal, was in three contentions.

1. Quinn says that he claimed the Fifth Amendment protection against self-incrimination. He says he did this by personally adopting the form of claim made by the prior witness, Fitzpatrick.

The trial court found as a fact that at no point did Quinn, while before the subcommittee, assert the privilege in explicit terms. The court then posed the question: "Can one claim a personal privilege against self-incrimination by reference to a position that another took?". The court said:

"On that, this Court finds as a matter of law that one may not. Since the privilege is personal, the defendant must assert it himself, since another may not know what is in a defendant's mind at the time he is called before the Congress to testify on pertinent matters, to proper inquiry, and therefore, one may not, by reference, assert that privilege."

The trial court therefore concluded that Quinn had not asserted his personal privilege in respect to self-incrimination.

■ We are of opinion that a witness may claim the constitutional privilege by referring to and adopting language used by another, so long, of course, as that other's language is identified. On that point we think the District Court was in error, and the Government so concedes. It is true that the privilege is a personal one[2] and the circumstances must be such as to indicate that the witness himself personally asserts

2. Rogers v. United States, 1951, 340 U.S. 367, 370–371, 71 S.Ct. 438, 95 L.Ed. 344.

the claim.[3] But, when a witness personally asserts that he adopts a described expression as his expression, the claim is personally made. No formula or specific term or expression is required. The language may be the witness's own composition or may be a quotation from another or may be the adoption of another's statement; so long as the witness himself personally makes the claim, either by words or by action, this requirement is satisfied no matter what form he uses.

■ Then the question is whether Quinn, by adopting Fitzpatrick's statement, asserted a privilege against self-incrimination. Basically, of course, that question concerns what was in Quinn's mind. But courts cannot act upon unrevealed intentions, and so the inquiry must be whether Fitzpatrick did or did not claim the privilege. If what he said did not amount to such a claim, Quinn's adoption of the statement did not amount to one. The trial court made no ruling upon the meaning or the sufficiency of Fitzpatrick's statement.[4] Having held that Quinn could not as a matter of law adopt it, the court was not called upon to consider it. In the view which we take of the case the efficacy of Fitzpatrick's statement as a claim of the privilege must be determined. The problem is whether it should be determined by this court or by the trial court.

The issue as to Fitzpatrick's statement, as we see it, is whether a reasonable auditor would understand from what Fitzpatrick said that he (Fitzpatrick) was claiming the right to refuse to answer because his answer might tend to incriminate him. The words which Fitzpatrick used are known, are in this record, and are not in dispute. What did those words mean as he uttered them?

Fitzpatrick's discussion, which was lengthy, related chiefly to First Amendment rights. He did not at any point make a clear and unequivocal statement that he claimed the privilege against self-incrimination. The closest he came to it were two references to the Fifth Amendment in the course of his long discussion of rights of free speech and thought. Once, before any questions had been asked him, he said, "This is a protection of the First Amendment to the Constitution, supplemented by the Fifth Amendment." And once he said, "I stand on the protection of the Constitution, the First and Fifth Amendments." There was no context indicating that a claim of the privilege was meant.

■ We think the words "Fifth Amendment", considered alone, do not constitute a formula which invokes the privilege against self-incrimination. The Fifth Amendment contains more than one clause. It contains two which are possibly pertinent here, the privilege against self-incrimination and the due process clause. The expression "I claim the protection of the First Amendment, supplemented by the Fifth" may well and reasonably mean "I claim the protection of the First Amendment to my rights of free speech and thought, supplemented by the guarantee of due process of law." The combination of First and Fourteenth Amendment protection is not unusual,[5] and the combined reference has the meaning just expressed. Of course, as a matter of constitutional law, a reference to the Fourteenth Amendment as supplementing the First is a reference to the due process clause as a vehicle for applying the First Amendment restrictions to the states, and in that sense reference to the Fifth Amendment as supplementing the First has no

---

3. As to whether claim may properly be made by the witness's attorney, see Jones v. Commonwealth, 1951, 327 Mass. 491, 99 N.E.2d 456, and cases collected in footnote 4 thereto; Musselwhite v. State, 1951, 212 Miss. 526, 54 So.2d 911. But see In re Leiby's Estate, Ohio App.1951, 101 N.E.2d 214, appeal dismissed, 1951, 156 Ohio St. 254, 101 N.E.2d 906, annotation at 75 Am.St.Rep. 339–340.

4. Upon his own trial Fitzpatrick was held to have claimed the privilege. United States v. Fitzpatrick, D.C.D.C.1951, 96 F. Supp. 491.

5. Joseph Burstyn, Inc. v. Wilson, 1952, 343 U.S. 495, 72 S.Ct. 777, 96 L.Ed. 1098; Niemotko v. Maryland, 1951, 340 U.S. 268, 71 S.Ct. 325, 95 L.Ed. 267; Cf. Gitlow v. New York, 1925, 268 U.S. 652, 666, 45 S.Ct. 625, 69 L.Ed. 1138.

**24**

meaning in a controversy over federal action. But we are considering an expression used by a lay witness, and familiarity with the combined phrase "First and Fourteenth" may account for the use of the phrase "First and Fifth" to indicate the full force of the First Amendment protections.

In our opinion the question here is whether Fitzpatrick's statement, in full text and context, related only to the claim of the rights of free speech and thought under the First Amendment, or whether an auditor could detect an intention to claim the privilege against self-incrimination, protected by the Fifth Amendment.

■ Words do not always have indisputable meanings. When they do not, their interpretation is a matter of law in some instances and a matter of fact in others. If an ambiguous phrase appears in a statute, its meaning is a question of law. If one occurs in a contract, its meaning depends upon the intention of the parties; and that may be an unalloyed question of fact. If the dispute concerns the meaning of the whole of a lengthy recital by a witness on the stand, the meaning is a question of fact.

■ Whether Fitzpatrick's meaning is a question of fact or a mixed question of law and fact is close to the borderline. Our opinion is that, in either event, the conclusion ought to be drawn in the first instance by the trial court. In the setting of a criminal case (which is all we have here), we do not think that strict analysis of whether a given inquiry presents a question of law or of fact or a mixed one of law and fact is controlling as to whether it may be determined in the first instance by an appellate court, especially where that

inquiry concerns the main issue in the case.[6]

Perhaps, if we were of clear opinion that Fitzpatrick, and therefore Quinn, did claim the privilege and so must be acquitted, we should dispose of the matter finally here and now. Under such circumstances we would reverse a judgment of conviction. But a majority of the court are not of that clear opinion.

■ The affirmance of a judgment of conviction involves some considerations different from those involved in the reversal of such a judgment. Basically, an accused can be convicted only upon a trial, and the function of an appellate court in affirming a conviction is circumscribed by that principle. A reversal may result in another trial. Generally determinations upon which a judgment of conviction finally rests ought to be made in the first instance by the trial court, not by the appellate court. It is upon this phase of the problem presented by this appeal that members of this court differ.

The judgment of the court is that the case should be remanded to the trial court for a new trial, at which the issue, if then raised, would be whether Quinn claimed the privilege by adopting the statement made by Fitzpatrick. Either or both of two views lead us to that judgment. One view is that in a criminal case an appellate court has no authority to make the initial determination of an issue such as this one, whether it be called a question of fact or a mixed question of law and fact, upon which a judgment of conviction would rest; that an initial decision upon such an issue must be made by the trial court, if a judgment of con-

6. See Miller v. United States, 6 Cir. 1948, 169 F.2d 865, where the Court of Appeals for the Sixth Circuit reversed and remanded a criminal conviction for determination by the trial court of a question of law, and the same case on a second appeal, 6 Cir. 1949, 173 F.2d 922, where the judgment of conviction by the District Court, after only a partial new trial, was reversed and remanded for new trial de novo. See also Litton v. United States, 8 Cir. 1949, 177 F.2d 416, 417, certiorari denied, 1950, 339 U.S. 921, 70 S.Ct. 620, 94 L.Ed. 1344: "This

* * * is an appellate court without power or jurisdiction to retry criminal cases, our authority being limited to reviewing alleged errors of law which may have been committed by the trial court." Compare 62 Stat. 963 (1948), 28 U.S.C.A. § 2106, with 37 Stat. 565 (1912), as amended, 48 U.S.C.A. § 1356 (1928), repealed by Act of June 25, 1948, 62 Stat. 991 [See 1948 Revised Judicial Code, 28 U.S.C.A. §§ 1291, 1292, 1294]. See Kemp v. Government of Canal Zone, 5 Cir. 1948, 167 F.2d 938, 942.

viction would follow. The other view is that an appellate court has some discretion in such circumstances but that in the present case the discretion should be exercised to cause a determination of the issue by the trial court, rather than to affirm a conviction upon the decision of an issue not considered by the trial court.

Two reasons are suggested why it might be appropriate, in the peculiar circumstances of this case, for this court to determine whether the privilege was in fact asserted by Fitzpatrick. The first is that trial by jury was waived and the case was tried by a judge alone. The second is that the evidence consisted primarily of a reading, by counsel for the subcommittee, of the transcript of the hearings before the subcommittee. But when a defendant waives trial by jury he does not thereby consent to a determination of his guilt or innocence by an appellate court. As to the second reason we think it is confused with the rule as to civil equity cases.[7] In those cases the trial judge makes specific findings upon the several facts and the appellate court must determine whether those findings are or are not "clearly erroneous". But no such situation exists in a criminal case. Moreover, one of the substantial rights accorded a criminal defendant by statute in the federal courts is the right of appeal. Were this court to affirm the conviction on a finding not considered below, the defendant would in effect be deprived of that right, for our finding, in the first instance, on the main issue, would be subject to review only on the grant of *certiorari* by the Supreme Court.

The Government urges that we affirm the conviction on the theory that the error of the trial court was harmless,[8] in that it could not reasonably be concluded from the evidence that Quinn by his adoption of Fitzpatrick's statements, asserted a claim of the privilege. We think that Rule 52(a) of the Criminal Rules should not be

interpreted in the circumstances of this case to require the appellate court to assume the function of considering initially the basic issue.[9]

2. Appellant's second point is that, before a witness before a congressional committee can be held in contempt for refusing to answer a question, he must be specifically directed to answer and his reasons for refusing to answer rejected or overruled. We have passed upon the point contrary to appellant's contention in Emspak v. United States, 91 U.S.App.D.C. 378, 203 F.2d 54, decided today. As was pointed out in Bart v. United States, 91 U.S. App.D.C. 370, 203 F.2d 45, also decided today, to constitute an offense refusal to answer must be intentional. It must appear that Quinn was aware of the intention of his inquirer that answers were required despite his objections. He said he adopted all of Fitzpatrick's statement. Fitzpatrick made a full statement before he was asked any questions, stating that he would refuse to answer, and before the questioning began the Chairman of the Subcommittee explained to him the necessity for answers. When Quinn himself was questioned, and after he had refused to answer, adopting Fitzpatrick's statement, the Chairman twice asked him to answer the question. The deliberate and intentional character of the refusal is an element of the offense, to be determined from all the circumstances by the trier of the facts. That issue will be before the trial court if the case is retried.

3. Appellant's third point is that, since ten members of the grand jury which indicted him were Government employees and two were wives of Government employees, he was entitled to a hearing on his motion to dismiss the indictment as void for that reason. We have also passed on this point contrary to appellant's contention in Emspak v. United States, supra.

7. Orvis v. Higgins, 2 Cir. 1950. 180 F.2d 537, certiorari denied, 1950, 340 U.S. 810, 71 S.Ct. 37, 95 L.Ed. 595.

8. Fed.R.Crim.P. 52(a), 18 U.S.C.A.

9. See Kotteakos v. United States, 1946, 328 U.S. 750, 757–777, 66 S.Ct. 1239, 90 L.Ed. 1557; Cole v. Arkansas, 1948, 333 U.S. 196, 68 S.Ct. 514, 92 L.Ed. 644; Bollenbach v. United States, 1946, 326 U. S. 607, 614, 66 S.Ct. 402, 90 L.Ed. 350.

The judgment of the District Court will be reversed and the case remanded for a new trial.

Reversed and remanded.

BAZELON, Circuit Judge, with whom EDGERTON, Circuit Judge, joins, concurring in the result.

While I agree to the reversal of the conviction and the remand for a new trial, I take a differing view with respect to some important questions.

## I.

■■■■■ The court concludes that there was no error in denying appellant a hearing for the purpose of demonstrating that Government employees were not qualified to act as grand jurors in this case. This conclusion rests on this court's view in Emspak v. United States, 91 U.S.App.D.C. 378, 203 F.2d 54, that appellant "did no more than assert existence of a 'miasma of fear' so clearly rejected in the Dennis case."[1] I

think the court misreads Dennis v. United States. Before discussing that phase of the court's opinion, however, I think it essential to consider the Government's contention that the rule of the Dennis case—whatever it is—applies only to a petit jury and not to a grand jury.

The Government says, "It is not free from doubt that partiality in a grand juror is *per se* disqualifying. * * * Historically, grand jurors were chosen for what they knew about affairs in the community, which in the case of a petit juror would be disqualifying."[2] "Partiality," resulting from knowledge, is one thing. But partiality resulting from fear induced by an atmosphere of intimidation, which appellant seeks to demonstrate, is quite another. In my view, the latter would be disqualifying. For "petitioner's federal constitutional right to a fair and impartial grand jury"[3] can be no less than that his indictors be free of fear that would paralyze the exercise of their free will.[4]

1. Emspak v. United States, 1952, 91 U.S. App.D.C. 378, 203 F.2d 56; Dennis v. United States, 1950, 339 U.S. 162, 70 S. Ct. 519, 94 L.Ed. 734.

2. Brief for Appellee in Emspak v. United States, p. 26. The Government concedes that while "The Fifth Amendment requires indictments only in capital 'or other infamous' crime, * * * where the Government has chosen or been compelled to proceed by indictment, the accused probably has standing to move to dismiss an indictment found by a disqualified body, just as he would have a right to attack an information filed upon the oath of a disqualified prosecuting officer." Id., at 26, note 3. And see Brief for Appellee in the instant case, p. 58.

3. Cassell v. Texas, 1950, 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839.

4. See Crowley v. United States, 1904, 194 U.S. 461, 472, 24 S.Ct. 731, 736, 48 L. Ed. 1075, where the Supreme Court quoted with approval from the "leading case" of Vanhook v. State, 12 Tex. 252, 268: "The better opinion, to be deduced from the authorities to which we have access, seems to be that irregularities in selecting and impaneling the grand jury, which do not relate to the competency of individual jurors, can, in general, only be objected by a challenge to the array. But that the incompetency, or want of the requisite qualifications of the jurors, may be pleaded in abatement to the indictment. And this doctrine and distinction seems founded on principle. It is the right of the accused to have the question of his guilt decided by two competent juries before he is condemned to punishment. It is his right, in the first place, to have the accusation passed upon, before he can be called upon to answer to the charge of crime, by a grand jury composed of good and lawful men. If the jury be not composed of such men as possess the requisite qualifications, he ought not to be put upon his trial upon a charge preferred by them; but should be permitted to plead their incompetency to prefer the charge and put him upon his trial, in avoidance of the indictment. Otherwise he may be compelled to answer to a criminal charge preferred by men who are infamous, or unworthy to be his accusers."

In United States v. Remington, 2 Cir., 1951, 191 F.2d 246, 252, appellant moved to quash the indictment contending "that the foreman, one Brunini, had a financial interest in a book which the government's chief witness was writing * * *." The Court of Appeals reversed for further proceedings pointing out that "[t]he indictment should not be quashed *unless undue influence is shown*" by Brunini on the other grand jurors. Ibid. (emphasis

It is unconvincing to tell us, as the Government does, that the "bias" here asserted would not, if proved, disqualify a grand juror. Neither the Supreme Court nor this court has ruled on the question. Even in regard to bias arising from a direct financial interest, the state cases are in confusion and this court might well start afresh in fashioning a rule for this jurisdiction.[5] I have discovered no case—state or federal—which considers whether fear induced by an atmosphere of intimidation disqualifies a grand jury.[6]

What the Government is proposing is *pro tanto* repeal of the Fifth Amendment's assurance of "a presentment or indictment of a Grand Jury."[7] It is true that the grand jury has been criticized as an anachronistic institution. But, as the Supreme Court has said:

"whatever force may be given to this argument, it remains true that the grand jury is as valuable as ever in securing * * * 'individual citizens' 'from an open and public accusation of crime, and from the trouble, expense, and anxiety of a public trial before a probable cause is established by the presentment and indictment of a grand jury;' and 'in case of high offenses' it 'is justly regarded as one of the securities to the innocent against hasty, malicious, and oppressive public prosecutions.' " [8]

The grand jury "is designed as a means, not only of bringing to trial persons accused of public offenses upon just grounds, but also as a means of protecting the citizen against unfounded accusation, whether it comes from government, or be prompted by partisan passion or private enmity."[9] The grand jury system derives from the notion "that no one shall be subjected to the burden and expense of a trial until there has been a prior inquiry and adjudication by a

supplied). And cf. United States v. Wells, D.C.Idaho 1908, 163 F. 313 (plea in abatement sustained—prosecuting attorney voluntarily appeared before grand jury and urged finding of indictment, stating views on law and sufficiency of evidence, etc.); but see United States v. Belvin, C.C.E.D.Va.1891, 46 F. 381, 384–385.

5. State v. Richardson, 1928, 149 S.C. 121, 146 S.E. 676 (indictment returned by grand jury chosen by commissioners who deposited in defendants' bank quashable if issue raised in time); see Joslyn v. People, 1919, 67 Colo. 297, 184 P. 375, 377, 7 A.L.R. 339 ("direct pecuniary interest" disqualifies grand juror); but cf. Coblentz v. State, 1933, 164 Md. 558, 166 A. 45, 88 A.L.R. 886 (depositors not disqualified from voting to indict insolvent bank's president); State v. Turner, 1905, 72 N.J.L. 404, 60 A. 1112. State courts are also in disagreement on whether members of a grand jury which previously indicted a defendant are qualified to serve on a grand jury which reindicts him for the same offense. People v. Hansted, 1901, 135 Cal. 149, 67 P. 763, 764 (not qualified—statute disqualifies if *"a state of mind* exists on his [grand juror's] part in reference to the case"—emphasis supplied); cf. State v. Bullard, 1905, 127 Iowa 168, 102 N.W. 1120 (statute disqualifying grand juror if he had such an

opinion "as would prevent him from rendering a true verdict upon the evidence" required disqualification if grand juror "would be an unfit person to sit upon a petit jury"); but see State v. Wilcox, 1889, 104 N.C. 847, 10 S.E. 453, 454 (dictum—"The fact that the magistrate who committed a *defendant was* foreman of the [indicting grand] jury * * * not * * * good ground for motion to quash [indictment]").

6. An atmosphere of intimidation clearly does disqualify a petit jury. Moore v. Dempsey, 1923, 261 U.S. 86, 91, 43 S.Ct. 265, 67 L.Ed. 543 (domination of trial by mob violence in courtroom); Frank v. Mangum, 1915, 237 U.S. 309, 335, 35 S. Ct. 582, 59 L.Ed. 969 (hostile public sentiment and mob domination of the courtroom).

7. Prosecution for violation of 11 Stat. 155 (1857), as amended, 52 Stat. 942 (1938), 2 U.S.C.A. § 192 need not, of course, be commenced by grand jury action. But see note 2, supra.

8. Ex parte Bain, 1887, 121 U.S. 1, 12, 7 S.Ct. 781, 787, 30 L.Ed. 849, quoting Chief Justice Shaw of Massachusetts in Jones v. Robbins, 8 Gray 329.

9. Ex parte Bain, supra, 121 U.S. at page 11, 7 S.Ct. at page 786, quoting Justice Field, in Charge to Grand Jury, 30 Fed. Cas.No.18,255, page 992, 2 Sawy. 667.

responsible tribunal that there is probable cause to believe him guilty."[10]

An ordinary citizen has slight protection from the activities of a grand jury. For example, he may be indicted without the benefit of a preliminary hearing before a committing magistrate,[11] and even though he has had no opportunity to appear on his own behalf.[12] As a witness, he must answer the questions of a grand jury which may be proceeding under an unconstitutional statute,[13] and questions which he thinks are not relevant to the subject of the grand jury's inquiry.[14] Delegation of such sweeping powers compels a balancing caution in the selection of those who exercise them. Freedom of will and conscience should be a minimal requisite in their selection.

Preservation of the integrity of the grand jury system is not merely a matter of individual concern. It touches our democratic insistence on the fair administration of law. When the grand jury is not properly constituted, "reversible error does not depend on a showing of prejudice in an individual case. * * * The injury is not limited to the defendant—there is injury to the jury system, to the law as an institution, to the community at large, and to the democratic ideal reflected in the processes of our courts."[15] For that reason, the Supreme Court has long included the grand jury within the scope of the Fourteenth Amendment's equal protection clause,[16] even in the absence of prejudice to an individual defendant.[17] It would be highly anamolous, then, to hold that neither the grand jury clause nor the due process clause of the Fifth Amendment affords a defendant any protection in the presence of the prejudice of an intimidated grand jury.

I turn now to the court's application of the Dennis case. Like Dennis, the present case is one "inherently touching the security of the Government, at a time when public feeling on these matters is notoriously running high * * *."[18] Of the twenty members of the grand jury which voted the present indictment, ten were Government employees and two others were wives of Government employees. By timely motion to dismiss (together with supporting affidavits) or, in the alternative, to grant a hearing in the matter, appellant called the court's attention to the existence of both known and alleged circumstances from which it was charged that Government employees could not be suitable jurors in this particular case. If they could not, then the indicting grand jury was illegally constituted and its indictment void since there were less than twelve qualified grand jurors.[19]

10. Beavers v. Henkel, 1904, 194 U.S. 73, 84, 24 S.Ct. 605, 607, 48 L.Ed. 882.

11. United States v. Gray, D.C.D.C.1949, 87 F.Supp. 436.

12. United States ex rel. McCann v. Thompson, 2 Cir., 1944, 144 F.2d 604, 605–606, 156 A.L.R. 240; Hale v. Henkel, 1906, 201 U.S. 43, 65–66, 26 S.Ct. 370, 50 L. Ed. 652.

13. Cf. Blair v. United States, 1919, 250 U.S. 273, 39 S.Ct. 468, 63 L.Ed. 979.

14. See id. 250 U.S. at page 282, 39 S.Ct. at page 471; United States v. McGovern, 2 Cir., 1932, 60 F.2d 880, 888–889, certiorari denied, 287 U.S. 650, 53 S.Ct. 96, 77 L.Ed. 561, and cases therein cited.

Legislation has been introduced in the Senate "to authorize * * * the appointment of special counsel and investigators to assist grand juries in the exercise of their powers." S. 2086, 82d Cong., 1st Sess. (1951).

15. Ballard v. United States, 1946, 329 U. S. 187, 195, 67 S.Ct. 261, 265, 91 L.Ed. 181.

16. The Fourteenth Amendment, however, does not require a state to proceed by way of indictment or presentment, even in a first-degree murder case. Hurtado v. California, 1884, 110 U.S. 516, 74 S. Ct. 111, 292, 28 L.Ed. 232. In about half the states and in England use of the grand jury as an investigative body and of indictment as a step in prosecution has been largely abandoned. Dession, Criminal Law, Administration and Public Order 857 (1948).

17. This development is summarized, and protested, in the dissenting opinion of Mr. Justice Jackson in Cassell v. Texas, 1950, 339 U.S. 282, 298, 70 S.Ct. 629, 94 L. Ed. 839.

18. Mr. Justice Frankfurter dissenting in Dennis v. United States, 1950, 339 U.S. 162, 183, 70 S.Ct. 519, 526, 94 L.Ed. 734.

19. Fed.R.Crim.P. 6(b)(2). See also note 2, supra.

In denying appellant's motion and striking appellant's supplemental affidavit [20] "for the reason that it is legally insufficient," the court said:

"In the absence of a showing of actual bias on the part of the members of the Grand Jury due to their employment in the Government of the United States or the Government of the District of Columbia, the indictment is not void. United States v. Wood, (1936) 299 U.S. 123 [57 S.Ct. 177, 81 L.Ed. 78]; Frazier v. United States, (1948) 335 U.S. 497 [69 S.Ct. 201, 93 L.Ed. 187]; Dennis v. United States, (1950) 339 U.S. 162 [70 S.Ct. 519, 94 L.Ed. 734]. In a particular case Government employees serving as Grand or Petit Jurors might be barred for implied bias when circumstances are properly brought to the Court's attention which convince the Court that Government employees would not be suitable jurors. No such circumstances are present under the force of the present motion to dismiss, nor were any such circumstances indicated in defendant's proffer of proof in support of the motion for a hearing on the qualifications of the Grand Jurors." [21]

This court, like the trial court, relies on the line of cases culminating in Dennis v. United States as a basis for the denial of a hearing on bias. Because I think this court misreads Dennis,[22] I cannot accept the conclusions built upon it.

When the Dennis case was called for trial, the accused moved for a transfer to another district on the ground that prejudice against him in the District of Columbia would prevent a fair trial.[23] He also challenged for cause all Government employees called to serve as petit jurors.[24] A short affidavit, presented in support of the transfer motion, asserted: (1) that the effect of Executive Order 9835, 5 U.S.C.A. § 631 note, known as the Loyalty Order, would bar a fair trial; (2) that the possibility of the House Committee on Un-American Activities taking note of anyone voting for acquittal would prevent a verdict of "not guilty"; and (3) that false rumors spread by the Washington press had discredited Dennis and prejudiced his right to a fair trial.[25] Although the Dennis brief in the Supreme Court contained lengthy discussions seeking to establish a "miasma of fear" which affected all Government employees, the record contained nothing but the affidavit with the assertions just described. The record also disclosed that no hearing was requested or proffer of proof made in connection with the issue of prejudice. In fact, counsel for Dennis expressly stated that he could "add nothing to the affidavit."[26] The motion for transfer and the challenges for cause to the jury on voir dire were denied. And it was the latter action that was sustained by the majority of the Supreme Court.

In the present case, however, counsel by extensive affidavits, request for hearing, and proffer of proof sought to develop and prove for the record certain circumstances bearing on the issue of bias. His attempt to show the impact of the loyalty and security programs on Government employees [27] differed materially from the showing in the Dennis case. There the Supreme Court carefully pointed out:

20. Appellant submitted an affidavit, J.A., pp. 15–17, and a supplemental affidavit, id. at 33–45. There is no notation in the record that the first affidavit was struck, but presumably the trial judge's action on the supplemental affidavit applied to the first affidavit as well.

21. J.A., p. 65.

22. See Morford v. United States, 1950, 339 U.S. 258, 70 S.Ct. 586, 94 L.Ed. 815.

23. Transcript of Record, p. 27, Dennis v. United States, 1950, 339 U.S. 162, 70 S. Ct. 519, 94 L.Ed. 734.

24. Id. at 64–5.

25. The affidavit appears in id. at 27–32.

26. Id. at 41.

27. For an interesting discussion of this problem, see Jahoda & Cook, Security Measures and Freedom of Thought: An Exploratory Study of the Impact of Loyalty and Security Programs, 61 Yale L. J. 295 (1952).

"\* \* \* the Loyalty Order pre-ceded the instant trial only by about three months. It was promulgated by the President on March 21, 1947. This trial began on June 23, 1947, and was concluded on June 26, 1947. On May 9, 1947, the President submitted to Congress a request for an appropriation to carry out the Loyalty Order, which was not enacted into law until July 31, 1947. It was not until August 18, 1947, that Standard Form 84, requesting certain pertinent information from each federal employee, was made available.

"The administrative implementation of Executive Order 9835, which was yet to come, was apparently not the subject of anticipatory fear by these jurors." [28] In marked contrast, the indictment in the present case was returned in November of 1950, by which time the Loyalty Order had been in full operation for more than three years. The affidavits in support of appellant's motion contain a recital of some generally known events and procedures, and allegations as to others, relating to the operation of that Order.

Moreover, instead of the argument in the Dennis brief in the Supreme Court that the Un-American Activities Committee had given lists of federal employees to the Attorney General,[29] the present record contains an affidavit referring, *inter alia,* to the temper of congressional criticism of the outcome of the first Hiss trial and the admission of Harry Bridges to bail. That criticism was directed against judges who enjoy the constitutional immunity of life tenure.[30] On that basis appellant sought to show that it would not be "far-fetched and chimerical" [31] to suppose that the challenged Government employees, who have no such immunity, might have feared the consequences of a similar attack following a refusal to indict.

There would be no point to a more detailed comparison of the record in this case with that in Dennis. It suffices that appellant's affidavits went considerably beyond Dennis in attempting to demonstrate that "Government employees \* \* \* have been the subject of an active campaign to determine whether they are in any way sympathetic or tolerant to 'Communism' or 'Communists,' or sympathetic to any person who in turn is associated with 'Communism' or 'Communists' or with organizations which have been called 'Communist Fronts' or with persons who may have been called 'Communist fellow travelers.' " [32]

Resolution of the disqualification issue does not depend upon whether the loyalty program or investigations by Congress have exceeded lawful bounds. No such question is before us. It depends instead upon whether these activities prevent Government employees from exercising the free will essential to the impartiality required for their service as grand jurors in this case. "The problems of security are real. So are the problems of freedom. The paramount issue of the age is to reconcile the two." [33]

Despite the differences between Dennis and the instant case, the Government argues that an attack on the qualifications of grand jurors must be "based on facts and not mere conclusions." The Government further asserts, without citing any authority, that unless appellant can advance a reason for "not making his whole showing in the usual form of affidavits \* \* \*" the trial judge can properly deny a hearing.[34]

28. 1950, 339 U.S. 162, 169–170, 70 S.Ct. 519, 522, 94 L.Ed. 734.

29. Brief for Petitioner, pp. 33–4, Dennis v. United States, 1950, 339 U.S. 162, 70 S.Ct. 519, 94 L.Ed. 734.

30. J.A., p. 37.

31. United States v. Wood, 1936, 299 U.S. 123, 150, 57 S.Ct. 177, 187, 81 L.Ed. 78.

32. J.A., pp. 34–6.

33. Concurring opinion of Mr. Justice Douglas, Joint Anti-Fascist Refugee Commit-tee v. McGrath, 1951, 341 U.S. 123, 174, 71 S.Ct. 624, 650, 95 L.Ed. 817.

34. Rule 12(b) (4) of the Federal Rules of Criminal Procedure reads:

"A motion before trial raising defenses or objections shall be determined before trial unless the court orders that it be deferred for determination at the trial of the general issue. An issue of fact shall be tried by a jury if a jury trial is required under the Constitution or an act of Congress. All other issues of fact

This position rests on a misconception of the nature of the proof required to disqualify a Government employee, and on a failure to make allowance for the difficulties inherent in establishing a state of mind [35] in the circumstances of this case.

It is well understood that a trial judge has wide latitude in disposing of objections to the qualifications of the grand jury. Where the grounds advanced in support of a motion to quash an indictment are clearly insufficient in law, a hearing would be without purpose. This was the situation in United States v. Rintelen,[36] relied upon by the Government. In that case, a plea in abatement simply charged that the "grand jurors [in finding the said indictment] were actuated by a strong temper and prejudice against the defendants as the result of false statements and vicious newspaper publications."[37] The court held that these were not allegations of ultimate fact. But the affidavits in the present case are markedly different both in their nature and specificity. Here they seek to show that in the prosecution of an alleged Communist, independent judgment cannot now be expected of Government employees because, as the President's Committee on Civil Rights said in 1947, "The freedom of opinion and expression enjoyed by these people is in many ways dependent upon the attitudes and practices of the government."[38] This charge of intimidation as a consequence, however unintended, of the loyalty and security situation,[39] is the crux of the distinction between the two cases.

A motion to quash an indictment should not, of course, be granted merely on legally sufficient allegations. The movant cannot insist that his allegations stand admitted in the absence of a denial.[40] Nor would I suppose that a trial judge must grant a hearing when it clearly appears that the factual basis on which the movant relies is frivolous. But where it appears from affidavits in support of legally sufficient allegations that their factual basis is not clearly frivolous and the movant seeks a hearing to prove them, it is reversible error to cut him short.[41]

Since appellant's legally sufficient allegations were supported by affidavits of circumstances which cannot be said to be frivolous, the foregoing principles required that his request for a hearing be granted in this case. It may well be that appellant will be unable to prove his allegations or to show such facts as would result in his securing the relief which he seeks. His burden of proof will undoubtedly be great. We might be unwilling to accept the sort of proof he may offer. But I cannot bring myself to concur in a view which forecloses all opportunity of showing the extent to which basic rights may have been infringed.[42] I could reach a contrary result only by adopting the premise that the partiality of a class of persons cannot in any case be attributed to an individual. But I think the Supreme Court precluded this premise by its assurance in Dennis, precisely with respect to Government employees as a class, that "[t]he way is open in every [such] case to raise a contention

---

shall be determined by the court with or without a jury or on affidavits or in such other manner as the court may direct."

35. See Jahoda & Cook, supra, note 27, at 305 et seq., for the possible effects of the climate of thought on a state of mind.

36. D.C.S.D.N.Y.1916, 235 F. 787.

37. Id. 235 F. at page 788.

38. To Secure these Rights: The Report of the President's Committee on Civil Rights, 1947, p. 101, quoted in J.A., p. 39.

39. See Jahoda & Cook, supra, note 27, at 298.

40. Martin v. Texas, 1906, 200 U.S. 316, 319–320, 26 S.Ct. 338, 50 L.Ed. 497; Brownfield v. South Carolina, 1903, 189 U.S. 426, 23 S.Ct. 513, 47 L.Ed. 882; Smith v. Mississippi, 1896, 162 U.S. 592, 16 S.Ct. 900, 40 L.Ed. 1082; see Glasser v. United States, 1942, 315 U.S. 60, 87, 62 S.Ct. 457, 86 L.Ed. 680.

41. Carter v. Texas, 1900, 177 U.S. 442, 20 S.Ct. 687, 44 L.Ed. 839; see also cases cited in note 40, supra.

42. Cf. dissenting opinion, Johnson v. Matthews, 86 U.S.App.D.C. 376, 383, 182 F. 2d 677, 684, certiorari denied, 1950, 340 U.S. 828, 71 S.Ct. 65, 95 L.Ed. 608.

of bias from the realm of speculation to the realm of fact." [43]

The difficulty with the subject generally seems to result from lack of clarity as to the substantive grounds for disqualification. This lack of clarity appears in the trial court's statement on the one hand that "Government employees * * * might be barred from implied bias"[44] and on the other hand that appellant was required "to show actual bias."[45] The distinction between the concepts of "actual bias" and "implied bias" is a problem in semantics arising from their chameleon-like quality.[46] But whether we use one term or the other, in their context here I think they necessarily mean a "state of mind" (not a technical conception)[47] which can reasonably be expected to follow from the "circumstances * * * properly brought to the court's attention."[48] It was the trial court's apparent failure to bring the substantive grounds for disqualification into sharp focus which blurred the issue relating to the applicable criteria for hearing and proof.

"For the ascertainment of this [disqualifying] mental attitude * * *, the Constitution lays down no particular tests and procedure is not chained to any ancient and artificial formula."[49] The procedure which the appellant adopted in this case was to ask that "a proper hearing be granted * * * that evidence may be produced in court to show actual bias did exist."[50] I would reverse the conviction and remand for a new trial because I think the trial court abused its discretion in denying appellant that hearing.

## II.

The view I take of another question might dispose of the entire case upon retrial. Appellant contends, in substance, that a charge of contempt cannot lie since he was not "specifically directed to answer * * * and his reasons for refusing to answer * * * were not rejected or overruled."[51] The nub of the problem rests upon the meaning of the key phrase "refuses to answer" in § 192. That section of the contempt statute provides in pertinent part:

"Every person who * * * summoned as a witness by the authority of either House of Congress, to give testimony * * * before * * * any committee of either House of Congress, willfully makes default, or who, having appeared, *refuses to answer* any question pertinent to the * * * inquiry, shall be * * * guilty of a misdemeanor, punishable by a fine * * * and imprisonment in a common jail for not less than one month nor more than twelve months."[52]

This problem is discussed in the opinion of the court in Bart v. United States.[53] There the court establishes this basic principle: "If a witness interposes an objection or query to the propriety of a question, *e. g.,* its pertinency, he may not be refusing

---

43. 1950, 339 U.S. 162, 168, 70 S.Ct. 519, 521, 94 L.Ed. 734.

44. J.A., p. 65.

45. Id. at 159. And both positions were taken in the trial judge's memorandum opinion quoted supra.

46. "In dealing with an employee of the government, the court would properly be solicitous to discover whether in view of the nature or circumstances of his employment, or of the relation of the particular governmental activity to the matters involved in the prosecution, or otherwise, he had actual bias, and, if he had, to disqualify him." United States v. Wood, 1936, 299 U.S. 123, 134, 57 S.Ct. 177, 179, 81 L.Ed. 78.

47. Id. 299 U.S. at pages 145–146, 57 S.Ct. at page 185.

48. Dennis v. United States, 1950, 339 U.S. 162, 173, 70 S.Ct. 519, 524, 94 L.Ed. 734 (concurring opinion of Mr. Justice Reed).

49. United States v. Wood, 1936, 299 U.S. 123, 145–146, 57 S.Ct. 177, 185, 81 L. Ed. 78. This language was quoted with approval in Frazier v. United States, 1948, 335 U.S. 497, 511, 69 S.Ct. 201, 93 L.Ed. 187.

50. J.A., p. 161.

51. Brief for Appellant, Statement of Questions Presented.

52. 11 Stat. 155 (1857), as amended, 52 Stat. 942 (1938), 2 U.S.C.A. § 192 (emphasis supplied).

53. 1952, 91 U.S.App.D.C. 370, 203 F.2d 45.

to answer. In such event both elementary justice and statutory provision require that he be made aware, by some method *at some time,* that despite his position the inquirer means that he shall answer the question."[54] Although there is no talismanic formula which the Committee must use in directing the witness to answer, I would state the principle this way: It must appear from all the circumstances that (1) the witness was clearly apprised, and not left to the risk of guessing upon pain of criminal penalties, whether the grounds for his objection to answering were accepted or rejected, and that (2) if rejected, he was given another opportunity to answer. Under this view the Committee would necessarily have to inform the witness *in time* to allow opportunity for answering. I think it implicit in Bart that the ruling must be that of the inquiring authority (the Committee here).[55] The court there says that "[i]f the actual questioner be counsel instead of the inquiring authority, or a member of it, the attitude * * * of that authority may be made clear by prior announcement or by acquiescence or ratification. That phase of the matter must be determined from the circumstances."[56] I take this to mean that it must clearly appear to a reasonable person in the position of the witness that the ruling is, in fact, that of the inquiring authority or its duly authorized presiding member acting on its behalf.[57]

A conclusive presumption of intent to violate the statute might attach to a naked refusal to answer, *i. e.,* a refusal without a statement, at the time, of the reason therefor.[58] But the court in Bart defines naked refusal as a refusal "without asserted legal justification."[59] If this means merely that an actual legal principle must be invoked to justify a refusal to answer, I agree. But if the court's opinion in Bart implies that the principle invoked must in fact be applicable to the circumstances of the particular case,[60] I disagree. The latter interpretation, by abolishing the distinction between the assertion of a claim, on the one hand, and its validity or applicability, on the other, would sap all substance from the basic principle enunciated by the court.

It is only after an intent to refuse has been established in accordance with the foregoing principles that the witness is "bound rightly to construe the statute."[61] And since, except for naked refusals, intent cannot be imputed to the accused as a matter of law, it must be determined as a question of fact, from all the circumstances, as an essential element of the crime. Before the court can consider the validity of any grounds, not plainly frivolous, for objecting to answer, intent to refuse must be thus determined.[62]

The foregoing construction of the key phrase "refuses to answer" is clearly indicated by an examination of the legislative history and of the cases decided under this statute.

In 1857 Congress enacted the contempt statute to supplement its inherent powers.[63] Congressman Davis, speaking for the proposing committee, said of the first section, which in all significant respects is identical

54. Bart v. United States, 91 U.S.App.D.C. 370, 203 F.2d 49 (emphasis supplied).

55. See, e.g., 98 Cong.Rec. 8686 (June 30, 1952) where the Committee directs the witness upon the request of Committee counsel.

56. See Bart v. United States, 91 U.S.App. D.C. 370, 203 F.2d 49.

57. See United States v. Kamp, D.C.D.C. 1952, 102 F.Supp. 757, 759, discussed infra.

58. See United States v. Bryan, 1950, 339 U.S. 323, 332-333, 70 S.Ct. 724, 94 L. Ed. 884.

59. 91 U.S.App.D.C. 370, 203 F.2d 47.

60. Ibid.

61. Sinclair v. United States, 1929, 279 U.S. 263, 299, 49 S.Ct. 268, 274, 73 L.Ed. 692, discussed infra.

62. For the reasons I expressed in Bart, I think the court cannot reach the question of the validity of the claim of the privilege against self-incrimination until it has been determined that the Committee clearly apprised the witness that it had rejected his claim.

63. 11 Stat. 155 (1857). See generally Cong.Globe, 34th Cong., 3d Sess., 403 et seq. (1857). And see In re Chapman, 1897, 166 U.S. 661, 672, 17 S.Ct. 677, 41 L.Ed. 1154.

with § 192:[64] "[I]t increases no power now existing in any committee and *confers* no power to be exercised either by the committee or the House. * * * I presume, therefore, that it does not *inflict* any burden on the citizen; that it throws guards around him."[65] It becomes pertinent therefore to determine the rights which committees' then afforded the witness during a hearing. At that time, the witness had the safeguards of the following procedure: The committee ruled on his objections, and, if adversely, provided at least one other opportunity to answer. Only then was the witness haled before the bar of the Senate or House to show cause why he should not be held in contempt for refusing to answer. The procedure of an 1857 House Committee investigating corruption illustrates the safeguards which Congress intended to preserve, not alter,[66] by this statute. Because the Committee believed that testimony being withheld by one James W. Simonton was ma-

terial to the inquiry, it postponed interrogation a short time "to give the witness [who claimed that he would be breaching a confidence] time for reflection on the consequences of his refusal."[67] After recalling Simonton and informing him that a refusal would result in contempt proceedings, the Committee again propounded the original question. Simonton for his former reason refused to answer, and for that refusal was called before the bar of the House to show cause why he should not be cited for contempt.[68] To construe "refuses to answer" as not requiring these committee safeguards would, contrary to congressional intent, "confer" new power on congressional committees and "inflict" new burdens on the citizen.

The intent of Congress is confirmed by what it has done since enacting the statute of 1857. It continued to deal with contempt under inherent powers and with the same procedures for 37 years, up to 1894,[69]

64. 11 Stat. 155 (1857), unchanged so far as is relevant here, as amended, 52 Stat. 942 (1938), 2 U.S.C.A. § 192.

65. Cong.Globe, 34th Cong., 3d Sess. 427 (1857), (emphasis supplied).

66. A contemnor could not be imprisoned beyond the life of the current session of Congress, Simonton, for example, could only have been imprisoned for five weeks. The statute was primarily aimed at remedying this major deficiency in Congress' inherent powers. See, e.g., remarks of Representative Orr, id. at 405–6, and of the Speaker of the House, Cong.Globe, 40th Cong., 2d Sess. 2579 (1868); and United States v. Bryan, 1950, 339 U.S. 323, 327, 70 S.Ct. 724, 94 L.Ed. 884.

It should be noted that Congress under its inherent powers and in furtherance of its investigative activities afforded the contumacious witness a continuing opportunity to purge himself prior to and following conviction. See, e.g., Cong. Globe, 34th Cong., 3d Sess. 413 (1857) (James W. Simonton); Cong.Globe, 37th Cong., 2d Sess. 831 (1862) (Henry Wikoff); and Potts, Power of Legislative Bodies to Punish for Contempt, 74 U. of Pa.L.Rev. 691, 780, 808–9 (1926). The statute makes no provision for a purge proceeding following conviction for contempt.

67. Cong.Globe, 34th Cong., 3d Sess. 403 (1857).

68. Id. at 411 et seq. Except for cases of a witness' failure to appear in response to a subpoena, so far as we can determine, on only one occasion between 1850 and 1857 did Congress consider contempt proceedings against a witness. Cong. Globe, 31st Cong., 1st Sess. 1679–80, 1694, 1714, 1716 (1850). During debate as to whether Thomas Ritchie, the witness, should be haled before the bar of the House to show cause why he should not be proceeded against in contempt, Congressman Stanton remarked that "the Committee did not indicate to [the witness after he declined to answer] that they were not perfectly satisfied." Id. at 1716. Congress decided not to call Ritchie before the bar of the House. Ibid.; House Journal, 31st Cong., 1st Sess. 1343, 1345 (1850).

69. See, e.g., reports and debate concerning committee proceedings in which a witness refused to answer certain questions after a committee had rejected his grounds. Cong.Globe, 40th Cong., 3d Sess. 771 (1869), (Florence Scannell); Cong.Globe, 42d Cong., 3d Sess. 952 (1873) (Joseph B. Stewart); 4 Cong. Rec. 1707–8 (1876), (Hallett Kilbourn— see Kilbourn v. Thompson, 1880, 103 U. S. 168, 26 L.Ed. 377 (concerning this proceeding but not raising or deciding the question considered here) ); 5 Cong.Rec. 352, 473 (1877), (E. W. Barnes, Enos Runyon).

when the first indictment was obtained under the statute.[70] In that case, In re Chapman, its constitutionality was upheld.[71] No question as to the meaning of the phrase "refuses to answer" was raised, for the witness demurred to the charge and the Congressional Record shows that he had been apprised by the committee.[72]

It was 30 years after the Chapman case and 67 years after enactment that the next indictment under the statute was obtained.[73] In that case, Sinclair v. United States,[74] the Court held that a witness refusing to answer, though acting in good faith on advice of counsel, "was bound rightly to construe the statute."[75] The case cannot be read to support the contention that a committee's ruling and a subsequent opportunity to testify are not required before a witness is subjected to this burden.[76] That question was not before the Court—no doubt because, as an examination of the record reveals, that committee had provided the safeguard we discuss here. Sinclair

was clearly apprised that his reasons for withholding testimony were rejected by the committee. After his counsel had fully presented his grounds for not answering, the committee, in Sinclair's presence, voted "that [he] be called to the stand to give testimony before this committee."[77] Sinclair then refused to testify and for this refusal was cited for contempt.

A random check of the citations for contempt of Congress for each year since the Sinclair episode of 1924 further supports this construction of the statute.[78] Until 1946, except for cases of naked refusals,[79] contempt proceedings were initiated only after a witness, fully apprised that his grounds were unacceptable, still refused to answer upon direction.[80] The Un-American Activities Committee itself, which confronts us with the problem here, originally provided this safeguard.[81] At some undetermined time since the close of the last war, this Committee, unlike other congressional committees—the Kefauver[82] and the

70. In addition to E. R. Chapman, there were six citations for contempt in 1894. 26 Cong.Rec. 5458, 6146, 6643, 8121 (1894), Senate Journal, 53d Cong., 2d Sess. 214–16, 238, 254 (1894), (Elisha J. Edwards, John S. Shriver, H. A. Havemeyer, J. E. Searles, J. W. McCartney, A. L. Seymour).

71. 1897, 166 U.S. 661, 672, 17 S.Ct. 677, 41 L.Ed. 1154.

72. Id. 166 U.S. 661, 17 S.Ct. 677; 26 Cong. Rec. 6143 et seq. (1894).

73. 65 Cong.Rec. 4785–91 (1924). (In 1916 H. Snowden Marshall was cited for contempt of Congress by publication, 53 Cong. Rec. 9639–70 (1916); he was released under habeas corpus proceedings. Marshall v. Gordon, 1917, 243 U.S. 521, 548, 37 S.Ct. 448, 61 L.Ed. 881.)

74. 1929, 279 U.S. 263, 49 S.Ct. 268, 73 L Ed. 692. To the same effect, see the Supreme Court's explanation of this case in United States v. Murdock, 1933, 290 U.S. 389, 397, 54 S.Ct. 223, 78 L.Ed. 381.

75. Id. 279 U.S. at page 299, 49 S.Ct. at page 274.

76. See Brief for Appellee, p. 50.

77. Sinclair v. United States, Supreme Court, October Term 1928, No. 555, Transcript of Record, pp. 147–50.

78. At least one citation for contempt by a witness refusing to answer certain questions for each year since 1924 in which Congress made such citations was examined. See note 100, infra, for citations.

79. See note 58 and text, supra.

80. See, e.g., 69 Cong.Rec. 2440, 5286–8 (1928) (Robert W. Stewart, Thomas W. Cunningham); 78 Cong.Rec. 1904 et seq. (1934) (William P. MacCracken); 86 Cong.Rec. 3694–5, 3857 (1940) (James H. Dolsen, George Powers); 90 Cong.Rec. 8163 (1944), Hearings before Committee to Investigate Campaign Expenditures on H.R. Res. 551, 78th Cong., 2d Sess. 453–5 (1944) (Edward A. Rumely).

81. See, e.g., 86 Cong.Rec. 3695, 3857 (1940), reporting the proceedings before the House Un-American Activities Committee which resulted in citation for contempt of James H. Dolsen and George Powers.

82. See, e.g., 97 Cong.Rec. 499 (1951) (Joseph Doto); and see remarks of Senator Kefauver: "I can only say * * * that I have previously stated that counsel have considered the matter and have advised the entire committee that the refusal to answer certain questions and to follow the direction of the chairman in these cases constitutes a contempt." Id. at 505–6.

Senate Judiciary,[83] for example—temporarily failed to do so.[84] Despite this Committee's lapse, there is no indication that Congress ever intended to give to the word "refuse," in contempt cases, the new meaning the Government urges here. The legislative history is overwhelmingly to the contrary.

Although United States v. Murdock [85] does not involve § 192 or its predecessors, it is the case most heavily relied upon by the Government to support the proposition that this section does not require the Committee to rule upon objections before a refusal constituting contempt can occur.[86] I cannot agree. Murdock dealt with certain provisions of the Internal Revenue Code of 1926 and 1928. It merely held, *inter alia*, that an individual who withholds from an internal revenue agent information specifically required by statute [87] was not entitled under the prevailing statutory scheme to a separate court proceeding to test his grounds for refusal prior to indictment. The Court did not discuss whether the agent would be required to reject the grounds and to direct an answer before a "refusal" could occur. This question was not even raised.[88] The Supreme Court has recently reminded us that in such circumstances a "case is not a binding precedent * * *." [89]

This question has, however, been directly considered in three recent district court cases. In United States v. Browder,[90] the court, in acquitting the defendant of contempt of Congress, said:

"A search of the record will not disclose one instance when the Committee or its presiding member overruled the defendant's objections [based on pertinency] or offered to set him right if, perchance, his observations were ill founded or his position untenable in the eyes of the Committee.

* * * * * *

"His objections were not acted upon and he had the right to believe that his views and explanations were acceptable to the Committee." [91]

This view was followed in United States v. Fox [92] where the court observed that "there is no reason why a different procedure [from that pursued in the courts] should be permissible in cases involving contempt of Congress." [93]

And again in United States v. Kamp,[94] the court declared:

"Committees of Congress must conduct examinations in such a manner that it is clear to the witness that the Committee recognizes him as being in default, and anything short of a clear cut default * * * will not sustain a conviction for contempt of Congress. * * * The witness is not required to enter into a guessing game when called upon to appear before a committee. The burden is upon the presiding mem-

---

83. See, e.g., Hearings before the Sub-Committee to Investigate the Administration of the Internal Security Act and other Internal Security Laws of the Committee on the Judiciary, U. S. Senate, 82d Cong., 1st and 2d Sess. 76 (1951).

84. We are informed by Government counsel on argument in the Bart case that the Un-American Activities Committee has recently resumed the traditional procedure which affords this safeguard; see, e.g., 98 Cong.Rec. 8683–6 (June 30, 1952) (Saul Grossman).

85. 1921, 284 U.S. 141, 52 S.Ct. 63, 76 L. Ed. 210.

86. See Brief for Appellee, p. 49 et seq.

87. United States v. Murdock, Supreme Court, October Term 1931, No. 38, Transcript of Record, pp. 20, 21.

88. It is interesting to note that the record discloses, as Judge Prettyman points out in his opinion in the Bart case, "that Murdock was made fully aware, in an extended discussion before the refusals, of the intentions of his questioners and of the consequences of refusal to answer their contemplated questions." Bart v. United States, 91 U.S.App.D.C. 370, 203 F.2d 49.

89. United States v. L. A. Tucker Truck Lines, 344 U.S. 33, 73 S.Ct. 67, 69.

90. D.C.D.C., Criminal No. 1784–50, (March 14, 1951). [No opinion for publication.]

91. Id. at 1, 4.

92. D.C.D.C., Criminal No. 1798–50 (June 29, 1951). [No opinion for publication.]

93. Id., Transcript of Proceedings, p. 3.

94. D.C.D.C.1952, 102 F.Supp. 757.

ber to make clear the directions of the committee, to consider any reasonable explanations given by the witness, and then to rule on the witness' response."[95]

Although the Supreme Court has not ruled directly on this question, there is support for this construction in United States v. Bryan.[96] There, in holding that a witness is required to inform the committee of his grounds at the time he objects to answering, and that grounds first raised at a court proceeding will not be considered, the Court said: "To deny the Committee the opportunity to consider the objection or remedy it is in itself a contempt of its authority and an obstruction of its processes."[97] Underlying this decision is an assumption that a committee is required to

rule on an objection. For if the committee is entitled to an opportunity to consider an objection, it would follow that the witness, in turn, is entitled to be clearly apprised of a committee's adverse ruling.

Considerations of fundamental fairness support this construction of the statute.[98] In fact, I believe that this is only a minimal requirement and that Congress might well consider amending this statute to include the opportunity for purge which it accords in proceedings under its inherent powers.[99] Another important consideration stems from the fact that Congress has felt obliged to cite more witnesses for contempt during the last 2½ years than during the preceding 92.[100] Although the procedure required by my view would not eliminate deliberately

---

95. Id. 102 F.Supp. at page 759.

96. 1950, 339 U.S. 323, 70 S.Ct. 724, 94 L.Ed. 884.

97. Id. 339 U.S. at page 333, 70 S.Ct. at page 731.

98. While recognizing the necessity of congressional power to compel testimony, Wigmore said prophetically: "Not only does the logic of the legislative needs call for a strict limitation of this power, but also the policy of the situation; for the Legislatures are not bound by, and do not employ, the evidential rules that in judicial trials protect parties and witnesses and check abuses of power. * * * Moreover, legislative inquiries are sometimes conducted for partisan purposes and personal aggrandizement, and there is a particular temptation to pursue the inquiry beyond the necessities of contemplated legislation and to assume improperly the function of a grand jury.
"* * * (4) The Judiciary are entitled to define and declare the limitations of the power." 8 Wigmore, Evidence § 2195, pp. 80–1 (3d ed. 1940).

99. See note 66, supra.

100. 1857–1949 113 citations for contempt (number of citations for each year in italics):
House Journal, 34th Cong., 3d Sess. 241, 271 (1857) *2*; House Journal, 35th Cong., 1st Sess. 258, 371 (1858) *2*; House Journal, 35th Cong., 2d Sess. 411 (1859) *1*; Senate Journal, 36th Cong., 1st Sess. 159, 178, 242 (1860) *5*; House Journal, 37th Cong., 2d Sess. 210, 298, 498, 948 (1862) *4*; Cong.Globe, 37th Cong., 3d Sess. 314, 370 (1863) *1*; House Jour-

nal, 39th Cong., 2d Sess. 166, 252, Senate Journal, 40th Cong., 1st Sess. 186 1867) *3*; House Journal, 40th Cong., 2d Sess. 729 (1868) *1*; House Journal, 40th Cong., 3d Sess. 226, 250, 392 (1869) *4*; Cong.Globe, 42d Cong., 3d Sess. 952, 956 (1873) *1*; House Journal, 43d Cong., 1st Sess. 716, House Journal, 43d Cong., 2d Sess. 51–2 (1874) *2*; House Journal, 43d Cong., 2d Sess. 159, 205 (1875) *2*; House Journal, 44th Cong., 2d Sess. 534, 588, 1189 (1876) *3*; Id. at 149, 219, 313, 631, Senate Journal, 44th Cong., 2d Sess. 87, 196, 228 (1877) *9*; Senate Journal, 46th Cong., 2d Sess. 73 (1879) *5*; 22 Cong. Rec. 1973, 2150 (1891) *1*; 26 Cong.Rec. 5458, 6146, 6643, 8121, Senate Journal, 53d Cong., 2d Sess. 214–16, 238, 254 (1894) *7*; 50 Cong.Rec. 1431–52 (1913) *1*; 53 Cong.Rec. 9639 (1916) *1*; 65 Cong Rec. 4785–91, 7216 (1924) *1*; 69 Cong. Rec. 2439, 5286, 5353, 7239 (1928) *2*; 78 Cong.Rec. 1914 (1934) *4*; 79 Cong. Rec. 13077 (1935) *2*; 80 Cong.Rec. 8222 (1936) *3*; 81 Cong.Rec. 953 (1937) *6*; 86 Cong.Rec. 3694, 3856, 4152, 4153, 4156 (1940) *5*; 90 Cong.Rec. 8163 (1944) *2*; 92 Cong.Rec. 2744, 3762–73, 7591, 10592, 10748 (1946) *20*; 93 Cong.Rec. 1128, 3804, 3814, 10770, 10780, 10794–802 (1947) *13*.
1950–June 1952 117 citations for contempt:
96 Cong.Rec. 12237, 12256, 12260, 12286–89, 12296–382, 13873, 13894, 14639, 15727 (1950) *64*; 97 Cong.Rec. 499, 506, 507, 1096, 1453, 3038, 3039, 7014, 8702, 9803, 12406, 12407 (1951) *45*; 98 Cong. Rec. 836–43 (Feb. 5, 1952), 1338 (Feb. 25, 1952), 2397 (March 17, 1952), 2537 (March 19, 1952), 3904 (April 9, 1952), 8675–83 (June 30, 1952) *8*.

arbitrary and obstructive resistance to congressional authority, it is calculated to eliminate resistance attributable to ambiguous procedures. It would thereby better serve the objectives of congressional power to compel testimony, namely, to effectuate the legislative function and to preserve the dignity of Congress.[101] A clear ruling upon a witness' reason for objecting to answer, and another opportunity to reply, increases the probability of securing desired information. And such a procedure more nearly comports with our traditional concept of the worth of the individual personality upon which the dignity of Congress and of all free institutions so vitally depends.

## III.

The court below adopted the erroneous view that appellant could not claim the privilege against self-incrimination by reference and adoption of the language used by another.[102] Thus it neither reached nor decided whether the adopted language amounted to a claim of the privilege against self-incrimination. I have joined with some of my brethren to constitute a majority of this court in ordering a new trial because I agree that minimally the court below ought to decide this question in the first instance.[103] Under my view, however, the court must not only determine (1) whether the adopted language amounted to a claim of the privilege against self-incrimination but (2) whether it amounted to any other claim (not plainly frivolous), such as, lack of pertinency or protection of First Amendment rights; and if it did amount to such a claim, then (3) whether the Committee clearly apprised appellant of its rejection and afforded another opportunity to answer; and only if this safeguard were provided, (4) whether the claim was valid.

FAHY, Circuit Judge, concurring.

■■■ I agree with Judge Prettyman's opinion that appellant was not entitled to a hearing on his motion to dismiss the indictment as void because ten members of the jury which indicted him were Government employees and two were wives of Government employees, but that the case should be remanded for a new trial (1) so that the issue whether or not Quinn claimed the privilege by adopting the statement made by Fitzpatrick may be initially decided in the trial court, and (2) for determination whether or not Quinn was aware of the intention of his inquirer that answers were required despite his objections. As the opinion states, the deliberate and intentional character of the refusal is an element of the offense. The necessity for awareness by the witness of the intention of his inquirer to require answers despite the witness' objections, and the necessity for a deliberate and intentional refusal, are shown by the analysis in Section II of Judge Bazelon's opinion. The formulation in Section III of his opinion of the issues involved furnishes a practical guide to the trier of the facts.

WILBUR K. MILLER, Circuit Judge, dissenting.

■■■ I agree with the majority that the trial judge erred in holding as a matter of law that Quinn could not adopt Fitzpatrick's statements for whatever they were worth. But, for reasons to be stated later, my view is that Quinn was not prejudiced by that erroneous ruling, and therefore I think my brothers of the majority are wrong in reversing his conviction and remanding the case for the trial judge to say whether Fitzpatrick did or did not claim the protection of the Fifth Amendment against being compelled to testify against himself.

The court's action in reversing and remanding seems to me to arise from, and to depend entirely upon, the following statements in the majority opinion:

101. For comments on Congress' investigatory power, see, e.g., In re Chapman, 1897, 166 U.S. 661, 671–672, 17 S.Ct. 677, 41 L.Ed. 1154; United States v. Bryan, 1950, 339 U.S. 323, 327, 70 S.Ct. 724, 94 L.Ed. 884; and cases cited in 8 Wigmore, Evidence § 2195, pp. 75–80 (3d ed. 1940). And see Potts, Power of Legislative Bodies to Punish for Contempt, 74 U. of Pa.L.Rev. 691, 780, 804–27 (1926).

102. Court's opinion, p. 4.

103. As expressed in my dissents in Bart and Emspak.

"* * * The trial court made no ruling upon the meaning or the sufficiency of Fitzpatrick's statement. Having held that Quinn could not as a matter of law adopt it, the court was not called upon to consider it."

Perhaps the trial judge was not "called upon to consider it," but I cannot believe the judge's erroneous legal conclusion, that Quinn could not claim immunity by adopting Fitzpatrick's language, precluded him from considering whether that language was legally sufficient as a claim of immunity from self-crimination. If the trial judge actually considered Fitzpatrick's statements and held them insufficient as a claim of privilege, my view is that we should regard that holding as an alternative basis for the finding of guilt, which after all was the ultimate finding of the trial judge. I do not believe we should set aside a correct ultimate finding that a defendant is guilty because the trial judge gave two reasons for it, one of which was wrong and one of which was right.

With those considerations in mind, I suggest the majority are incorrect in saying the district judge made no ruling upon the meaning or sufficiency of what Fitzpatrick said in attempted justification of his refusal to answer the question. If I am correct in that belief—that is to say, if the district judge did make such a ruling—then the sole basis for reversal disappears, and the remand is for the futile purpose of permitting the trial judge to make a finding which he has already made.[1]

Moreover, while I do not stress the point, I think it extremely doubtful whether the District Court was required, in the circumstances, to make a special finding concerning the sufficiency of Fitzpatrick's remarks as a claim of the privilege. Rule 23(c) of the Federal Rules of Criminal Procedure provides: "In a case tried without a jury the court shall make a general finding and shall in addition on request find the facts specially." The general finding referred to in the rule is a finding of either guilty or not guilty.[2] Here the trial judge announced the general finding of guilty as charged. No request for special findings was submitted.

I question whether, under Rule 23(c), a trial judge is required to make special findings on all the factual issues involved, when none had been requested, merely because he announced findings on some of the issues of fact in the course of the opinion which preceded his general finding of guilty. Be that as it may, however, I think it quite clear that in this case the trial court stated, while delivering his opinion, a finding that Fitzpatrick's statements did not amount in legal effect to a claim of the privilege against self-incrimination.

The erroneous legal ruling by the district court that Quinn could not adopt Fitzpatrick's language did not mean the judge had not read and considered that language, nor that he had not formed and expressed an opinion as to whether Fitzpatrick had actually claimed the privilege. The contrary appears. The trial judge's opinion shows he had read and considered Fitzpatrick's statements. He noted their nature and found them insufficient as a claim of immunity against compulsory self-incrimination. I quote from the District Court's opinion:

"* * * the Court will not go into detail of the position which Mr. Fitzpatrick took, other than to say that it certainly left much to be desired as

1. Furthermore, I doubt if the question whether Fitzpatrick's statements amounted to a claim of immunity is a question of fact at all. There is no issue as to what Fitzpatrick's language was,—there is no contrariety of proof as to what words he used. The question was, did that language, those words, constitute a claim of immunity? Counsel for Quinn conceded during oral argument that this is a legal question and not an issue of fact. But whether so or not, it is in my view unnecessary to decide, since I think the issue of fact (if it be such) which the majority say the trial court should have determined, and for the determination of which they remand the case, was actually decided by the trial judge, as I shall show later in this opinion.

2. 4 Barron, Federal Practice and Procedure, § 2124.

to whether he was actually claiming self-incrimination or not.

"It is to be observed that his answers—and I speak of Mr. Fitzpatrick's—were long and rambling. They had a major theme, which seemed to be that the committee was prostituting its office and seeking to aid a rival group in a forthcoming [local union] election."

To be sure, the judge did not apply the "finding of fact" label to this evaluation of Fitzpatrick's language, but that is immaterial. Whether the issue was one of fact or law, the judicial observations just quoted were tantamount to a finding that Fitzpatrick's remarks to the subcommittee did not amount to a reliance upon the shelter of the self-incrimination clause. For, when the judge said those remarks "certainly left much to be desired as to whether he was actually claiming self-incrimination or not," he was clearly saying Fitzpatrick had not asserted the claim in the way the cases say a witness must invoke it in order to be entitled to its protection. So, the erroneous legal ruling did not prejudice Quinn.

The privilege against self-incrimination, when invoked properly, is liberally construed and applied; but the language of the witness which is said to constitute a claim of the privilege is strictly construed and appraised. This will appear from cases hereinafter cited. Nor is the privilege automatically applicable to every question which requires an incriminating answer. It is personal to the witness, and is waived unless he claims it at the time when, and in the tribunal where, the question is asked. The Supreme Court said in United States v. Monia, 1943, 317 U.S. 424, 427, 63 S.Ct. 409, 410, 87 L.Ed. 276:

"The Fifth Amendment declares that 'No person * * * shall be compelled in any criminal case to be a witness against himself.' * * * The Amendment speaks of compulsion. It does not preclude a witness from testifying voluntarily in matters which may incriminate him. If, therefore, he desires the protection of the privi-

lege, he must claim it or he will not be considered to have been 'compelled' within the meaning of the Amendment."

What must a witness say in order to claim the privilege? He must in some manner fairly bring to the attention of the tribunal which must pass upon it, the fact that he is invoking and relying upon the constitutional privilege. He must claim it in no uncertain terms. He must use some expression directly indicative of the intention to claim this particular protection of the Fifth Amendment, as distinguished from other constitutional rights. In United States ex rel. Vajtauer v. Commissioner of Immigration, 1927, 273 U.S. 103, 113, 47 S.Ct. 302, 306, 71 L.Ed. 560, the Supreme Court said:

"* * * The privilege may not be relied on and must be deemed waived if not in some manner fairly brought to the attention of the tribunal which must pass upon it. See In re Knickerbocker Steamboat Company, D.C., 139 F. 713 [716]; United States v. Skinner, D.C., 218 F. 870, 876; United States v. Elton, D.C., 222 F. 428, 435."

In the Knickerbocker Steamboat case, cited by the Supreme Court, it was said:

"* * * Incriminating matter may appear but a party may not desire to resort to the privilege of not answering with respect thereto. If he does, he must say so in unmistakable language and give the reasons for shielding himself."

In the later case of Rogers v. United States, 1951, 340 U.S. 367, 370, 71 S.Ct. 438, 440, 95 L.Ed. 344, the Court said:

"If petitioner desired the protection of the privilege against self-incrimination, she was required to claim it. United States v. Monia, 1943, 317 U.S. 424, 427, 63 S.Ct. 409, 410, 87 L.Ed. 376. The privilege 'is deemed waived unless invoked.' United States v. Murdock, 1931, 284 U.S. 141, 148, 52 S.Ct. 63, 64, 76 L.Ed. 210. Furthermore, the decisions of this Court are explicit in holding that the privilege against

self-incrimination 'is solely for the benefit of the witness,' and 'is purely a personal privilege of the witness.'"

The following is from the opinion of the Eighth Circuit in Phelps v. United States, 1947, 160 F.2d 858, 872:

"There is, of course, no prescribed or crystalized formula for claiming the privilege against self-incrimination. The provision in 50 U.S.C.A. Appendix, § 922(g), (and in other recent statutes) that the privilege against self-incrimination must be 'specifically' claimed, would seem to imply, however, that there must be some expression directly indicative of the intention to claim the particular privilege, as distinguished from other possible rights, and reasonably communicative of the fact that this is what is being done."

The District Court for the Eastern District of Pennsylvania, in United States v. Miller, 1948, 80 F.Supp. 979, 982, said:

" * * * The witness, upon oath, must claim his privilege in no uncertain terms at the proceeding in which the information is sought or he will not thereafter be considered to have been 'compelled' within the meaning of the Amendment."

To this the court cited the Vajtauer case, supra, United States v. Murdock, 1931, 284 U.S. 141, 52 S.Ct. 63, 76 L.Ed. 210 and United States v. Benjamin, 2 Cir., 1941, 120 F.2d 521, 522.

The opinion in the Benjamin case was written by Judge Augustus N. Hand and was concurred in by Judges Learned Hand and Swan. The following quotation therefrom supports my belief that a witness cannot claim the privilege by announcing that he stands on his constitutional rights, thus leaving it to the court to guess the provision upon which he relies; and that he cannot claim it by saying he relies upon the First and Fifth Amendments without pointing out the particular protection which he seeks out of the several afforded by those two Amendments:

"The appellant filed a plea in abatement in which he alleged that he had been subpoenaed to appear before a grand jury investigating the subject matter of the above indictment. He alleged that he thereupon appeared and asserted his constitutional immunity against being compelled to testify, but notwithstanding this was examined and compelled to give testimony. Upon the trial of the plea it was shown that when he came before the grand jury he was told that he was at liberty to assert his privilege in respect to any answers to questions which might tend to incriminate him. He thereupon stated that he was going to stand upon his constitutional rights. In response to questions relating to his dealings with Bob he answered the questions freely without raising constitutional objections. He was not only a lawyer himself but appears to have been advised by counsel. We have no doubt that his rights were not invaded. It is to be remembered that the appellant had not the constitutional privilege to refuse to testify which belongs to a defendant on trial. He was subject to call as a witness and only had the right of any witness to decline to give answers when interrogated which might tend to incriminate him. O'Connell v. United States, 2 Cir., 40 F.2d 201, 205; Mulloney v. United States, 1 Cir., 79 F.2d 566. As Professor Wigmore has said, the privilege is 'an option of refusal and not a prohibition of inquiry'. Wigmore Evidence, 2d Ed., § 2268. The appellant is apparently under the erroneous impression that a general statement that he would stand upon his constitutional rights was a substitute for objections to answering specific questions."

From these authorities I deduce the principle that a witness waives the privilege unless he claims it clearly, distinctly, expressly, specifically and in unmistakable terms. When the district judge said Fitzpatrick's position "certainly left much to be desired as to whether he was actually claiming self-incrimination or not," he was finding that Fitzpatrick had not claimed the privilege in the fashion the cases say it must be invoked if waiver is to be avoided. In order

to amount to a claim, the language of a witness must leave *nothing* to be desired.

The majority of this court agree, I note, with the trial judge's appraisal of Fitzpatrick's statement. They say:

"Perhaps, if we were of clear opinion that Fitzpatrick, and therefore Quinn, did claim the privilege and so must be acquitted, we should dispose of the matter finally here and now. * * * But a majority of the court are not of that clear opinion."

We should not let the fact that Quinn and Fitzpatrick would have been entitled to the privilege, had it been invoked,[3] color our thinking as to whether the privilege was claimed. The question is not whether immunity should have been granted if claimed; it is whether the privilege was claimed. For, as the Supreme Court said in United States v. Murdock, 284 U.S. at page 148, 52 S.Ct. at page 64, 76 L.Ed. 210:

"* * * The validity of his justification depends, not upon claims that would have been warranted by the facts shown, but upon the claim that actually was made. The privilege of silence is solely for the benefit of the witness and is deemed waived unless invoked. Vajtauer v. Commissioner of Immigration, 273 U.S. 103, 113, 47 S.Ct. 302, 71 L.Ed. 560."

A brief analysis of the statements made to the subcommittee by Quinn and Fitzpatrick will suffice to show adequate support for the District Court's holding that neither claimed the protection of the Fifth Amendment against being compelled to testify against himself. I agree with the majority that their statements should be considered and evaluated "in full text and context." When Quinn was asked the crucial question, his immediate reply was this:

"I would like to make a statement along the lines that Mr. Fitzpatrick made yesterday in regard to a question

of that nature. I feel that the political beliefs, opinions, and associations of the American people can be held secret if they so desire."

When the question was repeated, Quinn said:

"I decline to discuss with the committee questions of that nature."

Thus Quinn gave his understanding of Fitzpatrick's reason for refusing to answer the question: he understood Fitzpatrick to have relied upon the constitutional right of the American people to keep secret their political beliefs, opinions and associations. This was an obvious reference to the freedom of speech clause of the First Amendment and its correlative freedom of silence, and was by no means an assertion of a personal claim by Quinn to refrain from answering on the ground that in doing so he might incriminate himself. Having stated that Fitzpatrick's statements could be regarded as the expression of his own views, Quinn said:

"* * * I may add I feel I have no other choice in this matter, because the defense of the Constitution, I hold sacred. I don't feel I am hiding behind the Constitution, but in this case I am standing before it, defending it, as small as I am."

This about covers Quinn's examination except for this further statement by him:

"Yesterday one of the Congressmen on the committee made the statement that people brought down here were being given an opportunity to clear themselves, as it were. I would like to say I don't feel it is an opportunity to clear myself. I feel the opportunity I am given here is a choice of clearing myself at the price of assisting this committee and destroying the Constitution, and I could not join the committee in doing that.

* * * * * *

---

3. The Supreme Court in Blau v. United States, 1950, 340 U.S. 159, 71 S.Ct. 223, 95 L.Ed. 170, held that questions as to connections with the Communist Party are subject to the privilege against self-incrimination as calling for disclosure of facts tending to criminate under the Smith Act, 18 U.S.C.A. § 2385.

"I think it is clear this hearing was called solely for the purpose of interfering with our election."[4]

Far from invoking a constitutional protection for himself, Quinn conceived that he was defending the Constitution against the encroachment of the subcommittee.

In the light of the foregoing, I suggest that no matter what Fitzpatrick had said, Quinn demonstrated his understanding of the statements he adopted as being that all the American people, including himself, had the right to keep secret their political beliefs, opinions and associations, and that he was prepared to defend this First Amendment freedom against the attack of the subcommittee.

Putting that suggestion aside, however, and assuming that Quinn's adoption of Fitzpatrick's language was without qualification on his part, so as to entitle him to the privilege if Fitzpatrick had in fact claimed it, I now consider Fitzpatrick's statements in full text and context. As the district judge observed, Fitzpatrick's remarks were long and rambling. He began by asking and obtaining permission to make a few preliminary remarks. After a diatribe against the committee, he said:

"I will answer all honest questions put to me, but I have no intention of joining with the people who seek to destroy the Constitution of this country, whether witnesses or anybody else. To me, the Constitution of this country is not a scrap of paper. It is something to be maintained. I have two sons. I want them to have the same freedoms and rights that I have enjoyed. If I can't leave this world a better world, I want to leave it just as good.

"The Constitution of this country provides certain protection for minorities and gives the privilege for people to speak and think as they feel they should and want to. It also gives the privilege that people can have opinions or beliefs that may be unpopular. In my opinion, it gives them the right to hold those opinions secret if they so desire. This is a protection of the First Amendment to the Constitution, supplemented by the Fifth Amendment."

Following this, Fitzpatrick was asked the question whether he was or had ever been a member of the Communist Party. His immediate response was this:

"Mr. Chairman, in my opening remarks I gave quite a bit of my attitude on this question. I say that this committee has no right to pry into my mind."

Upon insistence by the committee counsel that he answer "yes" or "no," or decline to answer, Fitzpatrick said:

"I will answer the question. The Constitution guarantees the right to me and every other citizen to have beliefs, whether they are popular or unpopular, and to keep them to themselves if they see fit, and I have no intention of being a party to weakening or destroying that protection in the Constitution. I feel when I take this position that I am one of the real Americans, and not like some of the phonies who appear here."

After this statement the following colloquy occurred between Fitzpatrick on the one hand and the chairman and counsel on the other:

"Mr. Wood. Now will you answer the question?

"Mr. Fitzpatrick. I have answered the question.

"Mr. Wood. It is not an answer at all.

"Mr. Fitzpatrick. That is my answer.

"Mr. Wood. Do you mean that is the only answer you are going to give?

"Mr. Fitzpatrick. That is the way it has to be answered, according to my conscience.

"Mr. Wood. Is that the only answer you will give to the question whether you are now or ever have been a member of the Communist Party?

---

4. Quinn and Fitzpatrick were, at that time, candidates for office in a local union at Pittsburgh. The union election, to be held soon thereafter, was that to which the appellant referred.

"Mr. Fitzpatrick. That is the only answer I can conscientiously give you.

"Mr. Tavenner. Mr. Fitzpatrick, you were present yesterday during the testimony here. You heard it stated under oath that you are a member of the Communist Party. Do you deny that accusation?

"Mr. Fitzpatrick. The answer to my previous question is the answer to this question. I have no intention of permitting this committee to abridge my constitutional rights on political opinions, associations, who I work with, who I meet with, what I read or think, or anything of that kind.

"Mr. Tavenner. So, in other words, you refuse to answer the question?

"Mr. Fitzpatrick. I don't refuse to answer the question. I have answered the question."

During the remainder of his testimony Fitzpatrick made such statements as:

"* * * I have no intention of discussing my political actions or activities with this committee, for the reasons that I have stated before."

"I say it is no affair of the committee what organizations I belong to. The previous answer applies."

"* * * So far as my beliefs, my political activities, my associations, affiliations, what I read, those are rights guaranteed to me and every other citizen of this Nation."

"* * * The opportunity you give me is to join with you and these other witnesses who appeared here yesterday and say the Constitution is a scrap of paper and it gives no protection to the people and you fellows have a right to delve into the mind of everybody who comes here."

"* * * Do you have thought control in the United States now? Are you going to convict people on thinking? I think maybe you fellows should read that Constitution."

I find nothing in Fitzpatrick's testimony which even indicates that he refused to say whether he was or ever had been a member of the Communist Party because he feared his answer might incriminate him, or that he relied on the self-incrimination clause of the Fifth Amendment in declining to respond. It is true that he mentioned the Fifth Amendment twice. His first reference to it was a preliminary remark which I have quoted above, when he said people can have unpopular opinions or beliefs and hold them secret if they so desire. "This," he said, "is a protection of the First Amendment to the Constitution, supplemented by the Fifth Amendment."

Thus he described his reference to the two Amendments as being the freedom of speech and silence guaranteed to all people by the First Amendment, as somehow supplemented by the Fifth,—perhaps the due process clause. His point was that all people have the right to keep silent as to their political opinions because the freedom of speech clause guarantees that right; that he shared in that right and refused to answer because of it,—not at all because to speak of his political opinions and associations might incriminate him.

A second time Fitzpatrick referred to the First and Fifth Amendments, when he was asked whether he had solicited one Copeland to join the Communist Party, and responded by saying:

"I will not talk about my association and actions with people who I know, what I did, or anything else. I don't think it reflects on my loyalty or disloyalty or anything else."

The chairman of the committee then inquired:

"Mr. Fitzpatrick, did you ever at any time during the year 1943 furnish an application blank and request Clarence D. Copeland to sign and make application for membership in the Communist Political Association, or the Communist Party?

"Mr. Fitzpatrick. Mr. Chairman, do I have to give you my answer again?

"Mr. Wood. I just want to know whether you did that one thing.

"Mr. Fitzpatrick. I say if I did or if I did not, regardless of what I did, it is not the affair of this committee to pry into this kind of action.

"Mr. Wood. And for that reason do you decline to answer the question?

"Mr. Fitzpatrick. I stand on the protection of the Constitution, the First and Fifth Amendments.

"Mr. Wood. And for those reasons decline to answer the questions further?

"Mr. Fitzpatrick. I have answered the question.

"Mr. Wood. I say, do you decline to answer it further?

"Mr. Fitzpatrick. I have no further comment on it."

In this instance also, Fitzpatrick made it abundantly clear he was not invoking the two Amendments to avoid giving an incriminating answer, but that he thought the Amendments barred the committee from asking the question which would pry into his mind and would violate his constitutional right to be silent if an answer were compelled. I find it impossible to regard Fitzpatrick's statements as amounting to a claim to the constitutional immunity from self-incrimination. Measured by the strict standards announced in the cases I have cited, by which the language of a witness must be measured in determining whether he actually intended to and did claim the privilege, Fitzpatrick's statements fall far short of constituting such a claim. As the trial judge said, they certainly leave much to be desired. Cf. Emspak v. United States, (1952) 91 U.S.App.D.C. 378, 203 F.2d 54.

I conclude, therefore, that the district judge not only did in fact find that Fitzpatrick did not claim the privilege, but also that he was amply justified in so finding, despite the fact that, after Quinn's conviction, Fitzpatrick himself was found not guilty by a different district judge, 1951, 96 F.Supp. 491, who seems not to have considered Fitzpatrick's statements "in full text and context," but acquitted him solely because he used the words "Fifth Amendment." I think it is impossible to spell out a claim of the privilege from Fitzpatrick's

references to the Fifth Amendment, when they are considered in full text and context. Considered in that realistic way, they show Fitzpatrick had no intention of invoking the Amendment's privilege against self-incrimination. I would affirm the judgment of the District Court.

I am authorized to say Judge PROCTOR concurs in this dissenting opinion; and that Judge CLARK also concurs except that, being of the opinion that the claim of privilege is a highly personal one and must be made by the person claiming it and not by reference, he thinks the trial judge was right in holding Quinn could not adopt the statements of Fitzpatrick.