## LITTON v. UNITED STATES.
### No. 13898.

United States Court of Appeals
Eighth Circuit.

Nov. 3, 1949.

Rehearing Denied Dec. 5, 1949.

Elmer Schoggen, Little Rock, Ark. (Ralph Morrow, Little Rock, Ark., was on brief), for appellant.

James T. Gooch, United States Attorney, and W. H. Gregory, Assistant United States Attorney, Little Rock, Ark., for appellee.

Before GARDNER, Chief Judge, and WOODROUGH and COLLET, Circuit Judges.

GARDNER, Chief Judge.

Appellant was convicted on six counts of an indictment, three counts of which charged the breaking of seals on box cars with intent to commit larceny, and three counts of which charged larceny of cigarettes from the box cars alleged to have been broken into, in violation of Section 409 [now §§ 659, 2117], Title 18 U.S.C.A. The offenses were all charged to have been committed within the jurisdiction of the court. In seeking reversal appellant, in his statement of points to be argued, states that (1) the evidence is insufficient to sustain the verdict; (2) the alleged confession was involuntarily obtained; (3) the trial court should have as a matter of law excluded the confession. The brief contains no other assignments nor statements of the grounds on which reversal is sought.

The case is presented to us on the apparent theory that it may be tried de novo. This, however, is an appellate court without power or jurisdiction to retry criminal cases, our authority being limited to reviewing alleged errors of law which may have been committed by the trial court. It will be observed that in appellant's statement of points to be argued there is but one reference to a ruling of the court and that is to the effect that "the trial court should have as a matter of law excluded the confession." This assignment makes no reference to what, if any, objection may have been interposed to the admissibility of the confession, nor does it cite any page or part of the record where the ruling complained of, if any, is to be found. It amounts simply to an invitation to search the record for a ruling which is alleged to have been erroneous. Rule 11 of this court provides, among other things, that a brief shall contain "A concise statement of the case in so far as is necessary for the court to understand and decide the points to be argued in the brief, giving the pages of the printed record where each fact stated can be found and verified. If a point relates to the admission or exclusion of evidence, the statement shall quote the evidence referred to, and any objections or other equivalent ac-

tion taken relative thereto, together with the rulings of the court thereon, giving the pages of the printed record on which the quotations appear." Apparently the statement of facts refers only to the ruling of the court at a preliminary hearing in the absence of the jury and makes no reference to the ruling of the court at the time the confession was offered in evidence. In this condition of the record we do not feel impelled to search the record for alleged errors not pointed out by appellant.

Under the point charging insufficiency of the evidence to sustain the verdict it is urged that it was incumbent upon the Government to prove that the three box cars involved were illegally opened and cigarettes taken therefrom within the Eastern Division of the Eastern District of Arkansas, and that the Government did not have sufficient proof, independent of the confession of the defendant, to establish these facts. In support of this contention it is argued that the corpus delicti had not been sufficiently established to warrant the admission of the confession at the time it was offered. Notwithstanding the failure of appellant to designate by reference or otherwise what particular ruling is complained of, and where in the record it is to be found, we have searched the record in an effort to ascertain what occurred at the time this document referred to in the record as a confession was offered in evidence.

At the request of the defendant a preliminary hearing was held in the court's chambers on April 7, 1948, at which time the court heard testimony with reference to the admissibility of the confession which it was assumed the Government would offer in evidence. By stipulation of the parties all the testimony taken at this preliminary hearing was introduced at the time of the trial and there was also introduced additional evidence bearing on this same question. At the close of the preliminary hearing the court ruled as follows:

"My ruling is that the confession was freely and voluntarily made, and I think it should go to the jury. Of course, the jury will be given proper instructions to this effect: that if they find it was involuntary, they are not to consider it.

"Mr. Moncrief: The defendant excepts to the ruling and holding of the court that the purported or alleged confession was voluntary, and we object and except to the ruling of the court that the purported or alleged confession can be submitted to the jury. The defendant asks the court to hold that the purported confession is not a voluntary confession, and the defendant asks the court to hold that the purported confession is not competent or admissible to be given in evidence."

The requested ruling was refused.

At the trial a witness was handed the written confession, which he identified. The following then occurred:

"Mr. Gregory: I now offer it in evidence, your Honor.

"The Court: All right; let it be received, subject to the defendant's objections, which are overruled."

It will be observed that the objection was based solely on the ground that the confession had not been voluntarily made. It was not claimed that the confession was not admissible because the corpus delicti had not been sufficiently established. This question not having been raised in the trial court we must hold that it was waived. Had it been then interposed, if there were any defects in the proof going to the establishment of the corpus delicti, they might then have been remedied. But quite aside from this we are satisfied that there was sufficient proof of the corpus delicti. In Ryan v. United States, 8 Cir., 99 F.2d 864, 869, it was argued that the defendant's admissions of guilt did not constitute sufficient evidence to prove the corpus delicti and that they should be given no consideration whatever. In response to this contention we said:

"It is true that the corpus delicti can not be established by such admissions or concessions alone. They must be corroborated by independent proof. However, such independent proof need not be strong enough in itself to establish the corpus delicti. Oldstein v. United States, 10 Cir., 99 F.2d 305, filed Oct. 14, 1938. * * *

"* * * The identity of the accused is not an element of the corpus delicti, and while extra judicial admissions or confessions of an accused are not of themselves sufficient to establish the corpus delicti, yet they may be considered in connection with other independent evidence in determining whether the corpus delicti has been proven and such evidence may in itself be sufficient to prove the identity of the accused or his connection with the crime, and where the evidence is circumstantial, the same proof which tends to prove the corpus delicti may also tend to prove the guilt of the accused."

In Oldstein v. United States, 10 Cir., 99 F.2d 305, the rule is stated as follows: "An extra judicial confession will not alone support a judgment of conviction. It must be corroborated by independent proof of the corpus delicti. The proof aliunde need not be strong enough of itself to establish the corpus delicti. It is sufficient if that proof and the confession, taken together, will warrant the jury in finding the defendant's guilt beyond a reasonable doubt."

To the same effect see: Vogt v. United States, 5 Cir., 156 F.2d 308.

A stipulation was entered into between counsel for the respective parties during the trial, the effect of which was to admit that all the cars described in the indictment moved in interstate commerce by common carrier; that each of them contained cigarettes as described in the indictment, and that each of them passed through the town of Brinkley, Arkansas, as charged in the indictment on or about the dates therein charged. The Government's evidence showed that at the times mentioned in the indictment the defendant was a resident of North Little Rock, Arkansas, which is some seventy or eighty miles distant from Brinkley, Arkansas, where the crime was alleged to have been committed; that on the early morning of February 25, 1947, between midnight and one o'clock a. m., a special agent of the St. Louis-Southwestern Railway Company discovered defendant in the yards of that company at Brinkley, Arkansas, walking along a freight train which had just arrived. On being questioned as to what his business was in the railroad yards, where he appeared to be inspecting the train, he replied that he was on his way to Wabbaseka, Arkansas. He was advised that the train for that place had been gone for more than two hours and on further questioning he said, "Maybe I was down there robbing your train." He had in his overcoat pockets burglar tools and a flashlight. The special agent then took him in charge and turned him over to the city police at Brinkley and on the same date an information was filed against him, charging him with vagrancy and trespassing upon the railroad property. Defendant entered a plea of guilty and was sentenced to eleven months and fifteen days on the County Farm of Monroe County, Arkansas, by a Justice of the Peace. There was evidence that the seals had been broken on the cars described in the indictment and that there had been removed from each car a number of cases of cigarettes, as charged in the indictment. Defendant was asked how he was able to locate these cars loaded with cigarettes and he explained that he detected them by smell.

A witness testified without objection that the defendant in explanation of why he was down in the railroad yards the morning of February 25, 1947, said that he was going to ride the freight train to Stuttgart; that he hadn't taken the passenger train or the bus because he wanted to save 30 cents; that he was in Little Rock when he and his buddy, named Raymond, ran onto two truck drivers and he went with the two truck drivers to Carlisle and started a crap game; that Raymond came along and put crooked dice in the game and the truck drivers got mad and that he and Raymond then went on to Brinkley with the truck drivers; that defendant mentioned about getting the cigarettes. This witness Henderson in answer to a question said,

"One particular thing I asked him about was, when we had enough evidence, that one time when these cigarettes was stolen there was a shotgun fired, and I asked Harold, 'Tell me what happened the night the gun was fired over there,' and he said Mr. Buis was in the truck waiting and he was around behind the truck loading the

cigarettes. * * * Litton said he was around behind the truck loading the cigarettes in the truck and when the gun was fired that scared Mr. Buis and he liked to have run off and left him and he had to run and catch the truck, and those four cases of cigarettes were left on the ground.

"Q. Tell the jury whether or not he told you anything about the robbery of a Rock Island train a few nights preceding the arrest by Frizzel. A. Yes, sir, he mentioned that robbery and said it was Kool cigarettes."

The four cases of cigarettes referred to as being left on the ground were found.

There was undisputed evidence that the crimes charged in the indictment had been committed. There was circumstantial evidence strongly indicating that defendant was implicated in these series of crimes. The written confession, if admissible, conclusively proved that defendant in conjunction with one Lewis Harrison Buis, perpetrated the crimes with which he was charged. This confession which was made to a representative of the Federal Bureau of Investigation, recites that, "I make this statement voluntarily and no force or threats were used to get me to make this statement. I know that I do not have to make a statement and in making this statement I realize that it can be used in a court of law against me."

The statement, omitting formal parts, reads as follows:

"* * * I have known Lewis Harrison Buis for about five or six months. During the past few months I have seen quite a bit of Buis and he helped me put a back spring in my 1937 Plymouth at my home. In December, 1946, Buis and I came to Brinkley, Arkansas, and looked around to see what the set-up was and what arrangements could be made for a future visit in the railroad yards. About two or three nights after this we came down to Brinkley, Arkansas, and parked the truck on a dirt road near the Cotton Belt tracks where the switching is done. We got here before the train arrived from Memphis, which train was a Cotton Belt train and arrives in Brinkley before midnight. We were sitting in the truck on the road near the tracks. When the train arrived in the yards the engine cut off and went off to the main line with the crew and left the cars sitting here unattended. I slipped up the field to the track and walked down the train until I came to a car of cigarettes.

"I felt that the car I located was a cigarette car since it had a nail in the hasp. I pulled the nail and broke the seal and opened the door of the car. In this car were Camel cigarettes, so I took several cases out and I believe there were around 12 cases. I laid these by the ditch and then after unloading the cases I wanted, I carried them across a field near an old mill yard where I stacked them. I then returned to the truck where Lewis was waiting for me, and we sat there until the cut of cars had been pulled back on the main line and taken out of Brinkley. During this time we noticed an individual pass the truck and go into the mill yard. After waiting a while we backed the truck into the mill yard and began loading the cigarettes in the truck. When I had just about finished loading the truck someone shot at us and I ran and jumped in the truck and Lewis drove away. We drove from Brinkley to North Little Rock and Lewis stopped the truck about a block from my house. I got out of the truck and walked home and Lewis drove on off in the truck with the cigarettes.

"Two or three days after this I was at the Dixie Lumber Co. and Lewis came over and after talking to a few of the fellows slipped me a $100.00. We didn't do anything during the holidays and the next time I saw him was when I helped him put a new motor in his 1938 Ford truck. This is the same truck that we made all of the trips to Brinkley in and it is the truck found near the Cotton Belt Yards when I was arrested. I can identify this truck as a 1938 Panel truck, with rear view mirror and government shields on the side. These shields indicated to me that this truck at one time belonged to the U. S. Government.

"We made arrangements to come to Brinkley again and see if we could get some cigarettes and on Friday, February 21, 1947, I met Lewis in front of my house after

dark. We drove to Brinkley, Arkansas, and drove further on down the road we were on before and parked the truck and I walked across the field to the Rock Island tracks. I didn't go across the field until after train came into the yard. I walked along the train and found a car that I thought was cigarettes. I pulled the nail and cut the seal when the train pulled out and went from Brinkley to Carlisle, Arkansas. I got in the truck and we rode to Carlisle and while the train was sitting here I threw out 8 cases of Kool cigarettes. I carried the cigarettes across a little field and Lewis helped me load them in the truck. Lewis had been waiting in the truck for me to come up with the cigarettes. We drove to North Little Rock and I got out of the truck on the corner of Oak and Broadway. Lewis gave me a $100.00 at this time and he left with the truck and the entire load of cigarettes.

"On Monday night, February 24, 1947, I called Lewis and we decided to come to Brinkley again for some more cigarettes. Lewis came by for me about 7:30 p. m. in his truck and we drove to Brinkley, Arkansas. We drove on out 70 Highway toward Memphis, Tennessee. We waited here on the side of the road until we saw the Rock Island train coming, and we let it pull in the yard ahead of us. The engine cut off of the train and went up toward the depot. I got out of the truck and walked over to a button factory and watched a car inspector walk down the train. Lewis drove back toward town along the Rock Island track and parked the truck. When the Cotton Belt train pulled in I went on down the road. Lewis was watching me and was going to drive the truck on down near where I was when the train stopped. I came on the track at the crossing and walked along the train and ran into Mr. E. M. Frizzel, Special Agent for the Cotton Belt Railroad. Mr. Frizzel then brought me on to the Brinkley Police Department.

"In addition to the above I recall another time I was over here which was actually the first box car robbery I participated in. The first and second visits were so close that I was confusing the second visit with the first. The first visit was around December 8, 1946, when I came to Brinkley with Lewis. He stopped by my house and picked me up and we drove directly over to Brinkley, Arkansas. We parked the truck in Negro town this night which is across the tracks. We sat in the truck until the Cotton Belt train came in, and I got out and went over among the cars after the engine cut off and went down by the coal chute. I walked along the train until I came to a car I thought was cigarettes due to the nail in the hasp. I pulled the nail and broke the seal. I opened the doors and found the car loaded with Camel cigarettes. I unloaded eight cases and I carried them across a ditch and up toward a fence setting on the old mill yard. Lewis got the truck and came down a dirt road by the compress, and I threw most of the cigarettes in the truck. Lewis helped me, but I believe that he only loaded one or two cases. We drove back to North Little Rock and I got out in front of my house. He didn't give me any cigarettes or money. A few days later he came by the lumber shed and gave me a $100.00. This took place at the Dixie Lumber Company, North Little Rock, Arkansas.

"On the night that I was arrested I didn't know what had happened to Lewis, but I figured he got in his truck and went back to Little Rock.

"On each occasion that I broke in the box cars I threw the seal and nail away near the area where the theft took place.

"I have read the above statement consisting of four and a portion pages and it is true and correct. I have initialed each page to show that I have read it."

It remains to consider the contention that the confession was not admissible because not voluntarily made. As has been observed, prior to the trial on the merits the court held a preliminary hearing in the absence of the jury and on the evidence produced the court held that the confession was voluntarily given but that he would submit the question to the jury on proper instructions. There is no contention that the Federal authorities said or did anything to the defendant which could in any manner have affected the voluntary character

of his statement. It is, however, claimed that prior to the time the statement was made the local police beat him. Defendant so testified and two convicts in the jail at the time of defendant's incarceration corroborated him. All claims of mistreatment or beating were specifically denied by the local officers. There was testimony that a doctor stripped him for examination and a lay witness testified that there was not a bruise, mark or scratch on his body except that one of his hands was scratched, which the defendant said had happened in the railroad yards. Photographs taken of him at the time showed no bruises or wounds. It was within the province of the court to weigh this evidence and to decide upon the credibility of the witnesses and we assume that the court credited the testimony of the Government in holding that the confession was voluntarily made. All the evidence that was produced before the Judge at the preliminary hearing was introduced before the jury and the court instructed the jury that it should "determine first, whether the defendant actually made said statements, oral and written, and if he made them, whether they were made by him voluntarily and of his own free will, and you will also determine whether said alleged confession is free from the taint of official inducement proceeding either from hope inspired by assurance made to the defendant, or fear of what might befall him if the confession was not made. You are also instructed that you are the judges as to what weight, if any, should be accorded said alleged written and oral statements of the defendant." The court further instructed the jury that the confession could not be used against him and should be totally disregarded unless the jury found that it was voluntarily made without threat, coercion or physical force having been used upon defendant. This instruction was given at the time the written confession was admitted in evidence and in effect it was repeated in the final instructions. There were no exceptions to the court's final instructions.

The jury having found the defendant guilty, that view of the evidence most favorable to the Government must now be taken and we must assume that all conflicts in the evidence with reference to the voluntary character of this confession were resolved against the defendant by the jury. Upshaw v. United States, 335 U.S. 410, 69 S.Ct. 170; United States v. Mitchell, 322 U.S. 65, 64 S.Ct. 896, 88 L.Ed. 1140; Lyons v. Oklahoma, 322 U.S. 596, 64 S.Ct. 1208, 88 L.Ed. 1481. We are of the view that there was no error in admitting the written confession and it follows that the verdict is sustained by susbtantial competent evidence. The judgment appealed from is therefore affirmed.

A true copy.