James Ivey **WYATT**, Appellant,

v.

**UNITED STATES** of America, Appellee.

No. 17295.

United States Court of Appeals
Fifth Circuit.

Jan. 14, 1959.

Rehearing Denied Feb. 18, 1959.

4. 29 U.S.C.A. § 160(e).

J. Hubert Farmer, Dothan, Ala., for appellant.

Ralph M. Daughtry, Asst. U. S. Atty., Hartwell Davis, U. S. Atty., Montgomery, Ala., for appellee.

Before RIVES, TUTTLE, and BROWN, Circuit Judges.

RIVES, Circuit Judge.

This appeal is from a judgment of conviction for white slavery, 18 U.S.C.A. § 2421. The questions presented are thus stated in appellant's brief:

"1. May a conviction be had against a defendant on the charge commonly known as 'white slavery' on his extra judicial confession uncorroborated by proof aliunde of the corpus delicti as to the transportation element of the offense charged?

"2. May the wife of a defendant be compelled by the District Judge to testify against her husband?"

The indictment charged, in substance, that on or about December 12, 1957, the defendant did knowingly transport in interstate commerce from Columbus, Georgia, to Dothan, Alabama, a woman, Mary Kathleen Byrd, for the purpose of prostitution.

Leroy Mills testified that in December 1957, he was a bellboy at the Hotel Martin in Dothan, Alabama; that on December 13 he made several calls to Room 110, then occupied by the woman and defendant; that on one of those calls, the defendant asked him, "Boy, how is business?" "And I said, 'What kind of business?' And then he said that, 'We are working, and if you get anything, to let us know.' Q. All right, and did— did the woman say anything in his pres-

ence at that time or not? A. Yes, she says— Q. Speak out loud? A. She says, 'You haven't had any business?' I said, 'Yes'm, I had two this morning, but I have turned them down.'" On this next visit to the room, the woman asked, "You haven't had any business yet," and he answered "No," whereupon the defendant said: "We are going out for awhile, and if you have any business to be sure to hold it for us; we will be back after a little while"; that later he went back to carry coca-colas, whereupon the following conversation ensued:

"A. Well, now, let's see, he said on this time, he asked me how was the night boy at—was he all right. I said, 'No, this boy is young, and just don't fool with him, the old boy will be back tonight.' He said, 'Well, you know a man when you see him,' he said, 'We will split fair with you and better than that, we will split—'

"Q. I didn't catch that last. A. 'We will split fair with you,' divide the money equal or fair, you know, that was what he meant; I understood what he meant.

"Q. Did he tell you how it was divided with you? A. Forty sixty.

"Q. Is that sixty to you or forty to you? A. It is forty to me and sixty to him.

"Q. I see. All right. And— A. And then he says, 'If business increases, we will do better, we will split fifty fifty.'"

He further testified that the man and woman became noisy and he went to the room to ask them to be quiet, that in the defendant's presence, "She said, 'How about the business, there ain't no business'; I said, 'No, it is just slow today.'"

Henry W. Hilson testified that he was a detective for the City of Dothan, Alabama; that he arrested the defendant on December 13, 1957, and found on his person two Southeastern Greyhound Lines bus stubs showing that they were issued December 12, 1957, for transportation from Columbus, Georgia, to Dothan, Alabama; that he made no threats or promises to the defendant, but the defendant made a voluntary statement to him. The defendant objected to that statement on the ground that the corpus delicti had not been proved. The court overruled the objection, and Hilson testified:

"A. He stated to me, sir, that he had purchased these tickets in Columbus, Georgia, and was going to Laguna Beach to see Mrs. Byrd's mother, and he was just stopped over in Dothan.

"Q. Did he tell you who rode from Columbus, Georgia, to Dothan, Alabama, on those tickets that he said he had purchased in Columbus, Georgia? A. He said he and Mrs. Byrd accompanied him to Dothan."

Mary Kathleen Byrd testified that she was formerly known as Mary Kathleen Byrd, that she is now Mary K. Wyatt, that the defendant is her husband. The following then occurred:

"Mr. Farmer: Your honor please may I—I don't want to be out of order, but I just want to remind your honor under—I withdraw—just—

"The Court: Get along.

"Q. But you are now married to this defendant?

"Witness: Your honor, may I say something?

"The Court: Yes, ma'm.

"Witness: I have here in my possession my marriage license that I would like to present to the court, and I refuse to testify in this case against my husband.

"The Court: All right. Is that your ground for refusing?

"Witness: That is my ground for refusing.

"The Court: Your objection is overruled.

"Mr. Davis: Let me see it.

"The Court: Just a minute; I am not interested in seeing it, it doesn't make any difference in a White Slave Traffic Act case, I checked the law on

it at lunch. The United States Courts in the case, most recently, Shores against United States, said that that is no ground for a wife refusing to testify, that the old common law privilege that gave a wife the right to refuse to testify did not exist in a White Slave Traffic Act case, where the wife is the alleged victim. She will testify.

"Mr. Varner: Your honor, I think it would be a little safer on that, we would like to offer to try to prove she is not actually married to this defendant, if the court refuses—

"The Court: I am not interested in whether she is married or not married to him, as far as the refusal to testify is concerned, because it doesn't make any difference."

The witness then testified that she was in Dothan on December 13, 1957; that she and the defendant came on the same bus from Columbus, Georgia; that the defendant bought her ticket, but that she gave him the money to purchase her ticket; that they came to the Martin Hotel and that she registered for herself and the defendant as Mr. and Mrs. James Wyatt; that both of them went to Room 110 at the Martin Hotel; that she stayed only a few minutes and then went to the Houston Hotel in Dothan, where she registered as Mary K. Byrd. She testified that she could not recognize Leroy Mills and that she was not present in the Martin Hotel during any conversation between the defendant and a bellhop, "only when the boy called it a disturbance when we was having an argument."

John W. Lill, Jr., testified that he is a Special Agent of the F.B.I. stationed at Dothan, that on December 14, 1957, the defendant made a free and voluntary statement to him. The defendant again objected on the ground that "* * * the Government has not proved the corpus delicti in this case." The court overruled the objection, and Mr. Lill testified:

"A. He told me at that time that he had been living at an apartment at 804-A Riverview Apartments in Phenix City, and that he was married on November 15, 1957, to Mary Kathleen Byrd.

* * * * * *

"A. He stated on December 12 he and Mary Kathleen Byrd, whom he referred to as 'Kitty' Byrd, left Columbus, Georgia, by bus and proceeded to Laguna Beach, Florida, that he had bought—had purchased the bus tickets to Dothan, and that after they arrived at Dothan that evening, they took a cab from the Greyhound Bus Station to the Hotel Martin, and Mary Kathleen Byrd Wyatt registered for both of them, and they were roomed at Room 110. He stated that they remained in that room that night and the next afternoon they had a quarrel about his drinking, and that she left to go to the home of an aunt in Dothan, and that he didn't see her again up until the time of that interview. He stated that the purpose of stopping in Dothan was that he had planned to do some drinking, and that he didn't want to go to the home of his mother-in-law, Mrs. Rogers, at Laguna Beach while he was drinking, and that he had decided to stop at the hotel in Dothan while—to wait until he was in condition to go on. And that is pretty much the summation of what he told me then. I went into some details.

"Q. Did he—did he—did you exhibit to him any—these bus stubs marked Government's Exhibits numbers 1 and 2? A. I did.

"Mr. Davis: May I have them please? A. Yes, I did.

"Q. What did he say about those? A. He said that these were stubs to the tickets that he had purchased for he and his wife to Dothan.

"Q. Did he tell you who this wife was? A. Mary Kathleen Byrd—Wyatt, he said. I interviewed him again the following day, on December 15, and at that time he told me that he had resided at the apartment of Mary Kathleen Byrd, and

that he—he had previously mentioned at the end of the interview on the 14th that he was not married to Mary Kathleen Byrd, he told me on the interview on the 15th that he had been living at an apartment at 1907 Avenue A in Phenix City, which was owned by Mary Kathleen Byrd, and that they left together on the afternoon of December 12, and that he purchased the bus tickets and they proceeded to Dothan, and that they stayed that night at the Hotel Martin, and that he got to drinking, that night he had sexual relations with her, and then she left the next day * * *."

The defendant did not testify and no witnesses were offered in his behalf.

■■ Admittedly, a conviction cannot be sustained on the uncorroborated admissions or statements of a defendant. It is sufficient, however, if there be some evidence independent of a confession, which, when taken with the confession, will warrant the jury in finding defendant's guilt beyond a reasonable doubt.[1] There was sufficient proof of the corpus delicti to authorize the admission of the defendant's statements and admissions.

■ ■ The jury could believe such parts of a witness' testimony as they found credible, and disbelieve other parts, and could draw all reasonable inferences from the evidence. In our opinion, the evidence was clearly sufficient to sustain the verdict, and no harm was caused the defendant by his counsel's failure to move for judgment of acquittal. Rule 29, Federal Rules of Criminal Procedure, 18 U.S.C.A. In the absence of such a motion, the evidence will be reviewed by this Court only to prevent a manifest miscarriage of justice,[2] and that does not appear in this case.

A more difficult question is posed by the second inquiry. "May the wife of a defendant be compelled by the District Judge to testify against her husband?" On the present record, we must assume that she was his wife. We shall assume, also, though it is not clear, that the defendant objected to her testimony, and that he, as well as the wife, claimed the marital privilege. So assuming, the recent case of Hawkins v. United States, 1958, 79 S.Ct. 136, would necessitate a reversal, but for the fact that in Hawkins the wife was not the victim and here she is. That distinction is vital. It was the ground upon which the District Court in the present case based its ruling "that the old common law privilege that gave a wife the right to refuse to testify did not exist in a White Slave Traffic Act case, where the wife is the alleged victim."

The *privilege* not to testify against one's husband or wife and the *disqualification* by marital relationship, as Professor Wigmore observes, "travel together, associated in judicial phrasing, from almost the beginning of their recorded journey."[3] Indeed, no distinction between the two need be recognized, for as the Supreme Court ruled in Hawkins v. United States, supra, 79 S.Ct. at page 138:

"* * * The Government does not here suggest that authority, reason or experience require us wholly to reject the old rule forbidding one spouse to testify against the other. It does ask that we modify the rule so that while a husband or wife will not be compelled to testify

1. Masse v. United States, 5 Cir., 1954, 210 F.2d 418; Vogt v. United States, 5 Cir., 1946, 156 F.2d 308; Tabor v. United States, 4 Cir., 1945, 152 F.2d 254; United States v. Echeles, 7 Cir., 1955, 222 F.2d 144; Flower v. United States, 5 Cir., 1902, 116 F. 241; Oldstein v. United States, 10 Cir., 1938, 99 F.2d 305; Litton v. United States, 8 Cir., 1949, 177 F.2d 416; United States v. Markman, 2 Cir., 1952, 193 F.2d 574.

2. Rule 29, Federal Rules of Criminal Procedure; Ansley v. United States, 5 Cir., 1943, 135 F.2d 207; Demos v. United States, 5 Cir., 1953, 205 F.2d 596.

3. 8 Wigmore, Evidence (3rd ed. 1940), § 2227, p. 221.

against the other, either will be free to do so voluntarily. Nothing in this Court's cases supports such a distinction between compelled and voluntary testimony, and it was emphatically rejected in Stein v. Bowman, supra, a leading American statement of the basic principles on which the rule rests. 13 Pet. 209, at page 223, 10 L.Ed. 129."

That case reaffirmed the general common law rule [4] to the extent that husband

4. The opinion of the Court of Appeals had emphasized that only the general rule and not any exception was involved in that case: "*With certain exceptions which have no bearing here*, it was the general rule at common law that neither husband nor wife was competent to give testimony as a witness for or against the other in any case, civil or criminal * * *." (Emphasis supplied.) Hawkins v. United States, 10 Cir., 1957, 249 F.2d 735, 736. Out of an abundance of caution, we have examined copies of the record and of such of the briefs as the Clerk of the Supreme Court found available in the Hawkins case. The record (p. 41) shows that the objection was general: "Mr. Summers: I object to any testimony, your Honor, because she is his wife." The briefs of Hawkins' counsel discuss only the general rule and do not mention the exception. The Government's brief in opposition to the grant of the writ concluded as follows: "Under all these circumstances, we conclude that this case does not raise the broad question as to whether a wife *who is not the injured party* is a competent witness against her husband." (Emphasis supplied.) In its brief on the merits, the Government treats the case as testing only the general rule, but does discuss the exception at some length as follows:

"The most important situation where marital concord is regarded as an insufficient ground for excluding spousal testimony is where the wrong was committed directly against the spouse. Here an exception was made from the earliest time,[24] but not upon the basis that the reason for the rule did not apply. Instead, it was said that there was a 'necessity' for receiving the spouse's testimony.[25] But the exception was limited (with some later liberalization in some jurisdictions) to cases of corporal violence directly against the spouse—a restriction which led to some incongruous results. Where a defendant was charged with forging his wife's name, his privilege against her adverse testimony was upheld.[26] Another case upheld the privilege where defendant was charged with stealing his wife's property,[27] and elsewhere it was held that a husband living separately from his wife could not testify where she was charged with burning his home.[28]

"Even more startling is the case where defendant took his seven-year-old stepdaughter into the woods near their home, ostensibly on some farm chore, and there ravished her. His conviction, based largely on the testimony of the child's mother, was reversed. The court said it would be too narrow an interpretation to confine the exception to cases where there was a physical wrong against the person of the spouse, but it should at least be confined to the cases where the wrong directly and vitally affected the conjugal relation, which rape of the child did not.[29] The court felt that relaxation of the rule could lead to unfounded charges as an easy way to bring about termination of the marriage relation.[30]

"24. See Trial of Mervin Lord Audley, 3 How.St.Tr. 401, 414 (1631), admitting such testimony 'where the wife is the party grieved, and on whom the crime is committed.'

"25. Bentham has his own curious explanation of the 'necessity': 'A cause between Doe at Ux admits as many fees as a cause between Doe and Roe. In a case where there is nobody to swear for Ux, if Ux were not admitted, there would be no cause, no fees. Rule:—admit her evidence.' Bentham, Rationale of Judicial Evidence (Bowring's Ed.) Vol. VII, p. 481.

"26. Ex parte Dickinson [Mo.App.], 132 S.W.2d 243, 245 (Mo.).

"27. Overton v. State, 43 Tex. 616, 618.

"28. State v. McMullins, 156 Miss. 663, 126 So. 662.

"29. Cargill v. State, 25 Okl.Cr. 314, 220 P. 64 [35 A.L.R. 133].

"30. This argument had been rejected three hundred years earlier in Lord Audley's Case, supra. 3 How.St.Tr. 401, 415, where the defendant, charged with certain acts of depravity toward his wife, unsuccessfully urged 'That his son was now become 21 years old, and he himself old and decayed; and the one would have his lands, and the other a young husband; and, therefore, by the testimony of them and their servants added to their own, they had plotted his destruction and death.'"

and wife may not testify *against* each other, but, significantly, we think, it noted the exception to that rule here pertinent:

"* * * The rule yielded to exceptions in certain types of cases, however. Thus, this Court in Stein v. Bowman, 13 Pet. 209, 10 L.Ed. 129, while recognizing 'the general rule that neither a husband nor wife can be a witness for or against the other,' noted that the rule does not apply 'where the husband commits an offence against the person of his wife.' 13 Pet. at page 221." Hawkins v. United States, supra, 79 S.Ct. at page 137.

That exception has existed at least since 1631, when it was recognized in a case bearing some resemblance to a modern "white slave" case, Lord Audley's Trial, 3 How.St.Tr. 401, 402, 414. There, the notorious Lord Audley had employed his servants as his nefarious instruments to rape his wife, and stood by while they executed his commands.

There has been doubt as to the extent of the exception. As Professor Wigmore says:

"The notion of Necessity, indeed, might commendably have been a broader one; the necessity of doing justice to other persons in general, when the spouse's testimony was indispensable, would have been at least as great. But the common lawyers here kept their eyes upon the ground, and did not allow their survey to exceed the range of immediate and unavoidable vision. Anyone could see that an absolute privilege in a husband to close the mouth of the wife in testimony against him would be a vested license to injure her in secret with complete immunity; and this much the common lawyers saw, and were willing to concede. Just how far the concession went, in concrete cases, was never precisely settled. It was given varying definition at different times; it certainly extended to causes involving corporal violence to the wife; and it certainly did not extend to all wrongs done to the wife." 8 Wigmore, Evidence (3rd ed. 1940), § 2239, p. 251.

Consistently with such doubt, the appellant argues:

"But admitting for the sake of argument that such an exception now prevails, there have been cases where possibly the exception would apply in Mann Act violations, as where the defendant brought about debauchery or enforced prostitution by abductions, beatings, and other aggravated assaults.

"But no such situation exists in this case. As a matter of fact, the testimony is to the effect that the woman provided her own transportation from Columbus, Georgia to Dothan, Alabama; that she had as much to say to the bell-hop about any prospective customers as the appellant; and that although she and appellant at such time might have been contemplating marriage, she

---

Incidentally, it is interesting to note that while Professor Wigmore disapproves of the general rule, he concedes that its application may sometimes be as unsportsmanlike as shooting quail on the ground.

"* * * it exemplifies that general spirit of sportsmanship which, as elsewhere seen, so permeates the rules of procedure inherent from our Anglo-Norman ancestors. The process of litigation (many learned judges agree) is a noble kind of sport; and certain rules of fair play should never be overstepped.

One of these is to give something of a start to the victim of the chase, to follow him by certain rules only, and to respect his feelings so far as may be. This complicates the sport, and adds zest for the pursuers by increasing the skill and art required by them for success. The expedient of convicting a man out of the mouth of his wife is (let us say) poor sport, and we shall not stoop to it. Such is the theory and the sentiment of sportsmanship."
8 Wigmore, Evidence (3rd ed. 1940), § 2228, p. 228.

 

was not at the time his wife; so that any possible offense at the time was not and could not have been one against the person of his wife."

■ ■ A husband, bound legally and morally to protect his wife, but who instead helps her to be a prostitute, cannot be heard to argue that she is as depraved as he. That is a manifest impossibility. The fact that the transportation occurred before marriage certainly would not any the more disqualify the wife.[5] The law is now settled in favor of the exception by a long line of decisions under this same Act [6] with only two early cases to the contrary.[7]

The Supreme Court in the Hawkins case, supra, refers to none of the many pertinent cases just mentioned and evinces no intent to repudiate them.

Finding no reversible error in the record, the judgment is

Affirmed.

On Petition for Rehearing.

PER CURIAM.

In our original opinion we had said in part:

"* * * In our opinion, the evidence was clearly sufficient to sustain the verdict, and no harm was caused the defendant by his counsel's failure to move for judgment of acquittal. Rule 29, Federal Rules of Criminal Procedure [18 U.S.C.A.]."

That is factually incorrect. The defendant did move for a judgment of acquittal and his motion was denied. With such correction of the opinion, the petition for rehearing is

Denied.

---

5. United States v. Williams, D.C.Minn. 1944, 55 F.Supp. 375, 380; 8 Wigmore, Evidence, 3rd ed. 1940, § 2239, pp. 255, 256, notes 10 and 12.

6. United States v. Rispoli, D.C.E.D.Pa. 1911, 189 F. 271, 273; Cohen v. United States, 9 Cir., 1914, 214 F. 23, 29; United States v. Bozeman, D.C.W.D. Wash.1916, 236 F. 432; Pappas v. United States, 9 Cir., 1917, 241 F. 665, 666; Denning v. United States, 5 Cir., 1918, 247 F. 463, 465, 466; Cohen v. United States, 5 Cir., 1941, 120 F.2d 139, 140; United States v. Mitchell, 2 Cir., 1943, 137 F.2d 1006, 1008, 1009;

United States v. Williams, D.C.Minn. 1944, 55 F.Supp. 375, 380; Wilhoit v. Hiatt, D.C.M.D.Pa.1945, 60 F.Supp. 664, 665; Levine v. United States, 5 Cir., 1947, 163 F.2d 992; Hayes v. United States, 10 Cir., 1948, 168 F.2d 996, 997; Shores v. United States, 8 Cir., 1949, 174 F.2d 838, 839-841; Annotation, 11 A.L.R.2d 646, 656-658; Accord., Alford v. Territory of Hawaii, 9 Cir., 1953, 205 F.2d 616, 619.

7. United States v. Gwynne, D.C.E.D.Pa. 1914, 209 F. 993, 995; Johnson v. United States, 8 Cir., 1915, 221 F. 250, 251.